TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00826-CV






Appellant, Waste Management of Texas, Inc. // Cross-Appellant,

Texas Disposal Systems Landfill, Inc.


v.


Appellee, Texas Disposal Systems Landfill, Inc. // Cross-Appellee,

Waste Management of Texas, Inc.






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. D-1-GN-97-012163, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING




M E M O R A N D U M O P I N I O N




 This is a defamation case that was previously tried to a jury, reversed and remanded
on appeal, and tried to a jury again. In this second appeal, Waste Management of Texas, Inc.,
challenges, in seven issues, the second jury verdict in favor of Texas Disposal Systems Landfill, Inc.,
and in one cross-issue, Texas Disposal challenges the district court's application of the statutory
cap to the jury's award of exemplary damages. For the reasons set forth below, we will affirm the
judgment.


BACKGROUND

 The factual and procedural background of this case is detailed at length in
Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc., 219 S.W.3d
563 (Tex. App.--Austin 2007, pet. denied) (Texas Disposal I). Generally stated, however,
Waste Management and Texas Disposal are competitors in the waste-removal and landfill-services
industry serving the Austin and San Antonio markets. This case arises from Waste Management's
January 30, 1997, anonymous publication of a one-page document, titled "Action Alert," to Austin
environmental and community leaders. The Action Alert conveyed to its readers allegations that
increased traffic and environmental problems would result from Texas Disposal's proposed landfill
contract with the City of San Antonio, questioned the environmental integrity of Texas Disposal's
landfill in Travis County, and urged recipients of the document to contact public officials in
San Antonio, Austin, and the media with the readers' "concerns." After publication of the Action
Alert, Texas Disposal filed suit against Waste Management alleging that it had attempted to
disparage Texas Disposal's reputation to eliminate it as a competitor and asserting claims for
defamation, tortious interference with an existing prospective contract, business disparagement, and
antitrust violations based on the alleged conduct. See id. at 570. After various motions for summary
judgment that eliminated most of these claims, Texas Disposal tried its defamation claim to a jury,
which found that statements in the Action Alert were false and made with actual malice, but that
Texas Disposal had suffered no damages. The district court entered a take-nothing judgment against
Texas Disposal, which it appealed in Texas Disposal I.

 In Texas Disposal I, this Court held, among other things, that the district court had
erred by refusing to include a question about defamation per se in the jury charge. Specifically, we
held that because there were underlying fact issues regarding whether Waste Management's Action
Alert was defamatory per se--i.e., whether the meaning and effect of the words in the Action Alert
tended to affect Texas Disposal injuriously in its business--the district court had abused its
discretion by refusing to submit Texas Disposal's requested defamation-per-se question and
instruction. Id. at 583-84. The omitted question would have instructed the jury that a statement is
defamatory per se if it affects an entity injuriously in its business, occupation, or office, and then
asked the jury to determine if the statements and implications in the Action Alert were defamatory
per se. The question further instructed the jury that, in making its determination, it should consider
the Action Alert as a whole and in light of the surrounding circumstances. Id. at 580-81. Based on
that charge-error holding, we remanded the case to the district court for a new trial. See id. at 584.

 Regarding damages, we held that if the jury found on remand that the statements
in the Action Alert were defamatory per se, then Texas Disposal would be entitled to some amount
of presumed general damages for injury to its reputation. We based this holding on the legal
presumption that a plaintiff who is the subject of a statement that is found to be defamatory per se
suffered at least some actual damages even without independent proof of general damages. Id.
at 584. We further noted that the amount of actual damages is left to the jury's discretion and that
proof of actual injury is required to recover special damages such as lost profits, incurred costs, and
lost-time value. Id. at 581 n.19, 584 n.22.

 On remand, the district court included in the jury charge a question on defamation
per se with its associated instructions, and the jury found in favor of Texas Disposal, awarding
it $450,592.03 for reasonable and necessary expenses, $0 for lost profits, $5 million for injury to
Texas Disposal's reputation by the defamatory statements, and $20 million as exemplary damages
based on the jury's finding that Waste Management published the defamatory statements with
malice. Applying the statutory cap to the jury's award of exemplary damages, the district court
treated the jury's $5 million award for injury to Texas Disposal's reputation as non-economic
damages and reduced the exemplary damage award to $1,651,184.06.


Defamation

 The issues in this second appeal solely involve Texas Disposal's claim that
Waste Management's publication of the Action alert defamed Texas Disposal. "The law of
defamation addresses injury to reputation by communications--usually words." 1 Robert D. Sack,
Sack on Defamation § 1:1 (4th ed. 2011); see Texas Disposal I, 219 S.W.3d at 580; Black's Law
Dictionary 479 (9th ed. 2009) (defining defamation as the "act of harming the reputation of another
by making a false statement to a third person"). The law of defamation encompasses the common
law claims of libel and slander. See Sack on Defamation at § 1.1. Because of constitutional
concerns that often arise in defamation claims, the elements of a cause of action for defamation can
vary depending on the identities of the parties and the character of the alleged defamatory statement.
See Sack on Defamation § 2:1. For example where, as here, the case involves public speech about
a matter of public concern, the plaintiff must show that the defendant published a false, defamatory
statement about the plaintiff with actual malice. (1) See Gertz v. Robert Welch, Inc., 418 U.S. 323, 342
(1974); New York Times Co. v. Sullivan, 376 U.S. 254, 283 (1964); Texas Disposal I, 219 S.W.3d
at 574-75. In this context, "actual malice" means that the defendant published the statement with
knowledge of its falsity or with reckless disregard to its falsity. See New York Times, 376 U.S.
at 279-80; Bentley v. Bunton, 94 S.W.3d 561, 590 (Tex. 2002); Texas Disposal I, 219 S.W.3d
at 575. Whether a statement is defamatory is a question of law. See Musser v. Smith Prot. Servs.,
Inc., 723 S.W.2d 653, 654 (Tex. 1987). If the defamatory statement alleges that the plaintiff
committed a crime, has contracted a "loathsome disease," is "unchaste" or has committed serious
sexual misconduct, or tends to injure a person in his office, profession, or occupation, the defamatory
statement is considered defamatory per se, which means that the communication will support a
cause of action for defamation without proof of actual pecuniary loss. See Salinas v. Salinas, --
S.W.3d --, No. 11-0131, 2012 WL 1370869, at *2 (Tex. Apr. 20, 2012) (citing Bentley, 94 S.W.3d
at 604); Texas Disposal I, 219 S.W.3d at 580; Sack on Defamation § 2:8:2. Stated another way, a
finding of defamation per se entitles the plaintiff to a presumption of general damages. See Bentley,
94 S.W.3d at 604 (addressing libel per se). (2) This distinction is thought by some to have developed
because each of these categories of defamatory statements involves circumstances in which it
would be difficult for the subjects of the statement to trace specific financial losses. See Sack on
Defamation at § 2:8:2. Whether a communication constitutes defamation per se is usually a legal
question for the court. See Texas Disposal I, 219 S.W.3d at 581.


WASTE MANAGEMENT'S APPEAL

 Waste Management challenges the district court's judgment in seven issues, arguing
that the district court erred by (1) instructing the jury that it could award presumed damages without
any proof of damages; (2) asking the jury to determine whether statements in the Action Alert were
defamatory per se; (3) rendering judgment on Texas Disposal's claim for defamation despite the fact
that the cause of action is designed to protect the personal reputation of a natural person, not a
business such as Texas Disposal; (4) rendering judgment for Texas Disposal when the evidence
was insufficient to show that Waste Management wrote and distributed the Action Alert with
actual malice; (5) rendering judgment for Texas Disposal when the evidence was insufficient to
support the $5 million injury-to-reputation award and the finding that the Action Alert was
false, and insufficient to show causation and common-law malice; (6) excluding certain of
Waste Management's evidence; and (7) awarding exemplary damages that are grossly
disproportionate to the offense.


Presumed damages

 In its first issue, Waste Management asserts that the district court erred in submitting
the following question to the jury:


QUESTION NO. 7


 What sum of money, if paid now in cash, would fairly and reasonably
compensate [Texas Disposal] for damage to its reputation caused by the publication
of the statements or implications regarding which you answered "Yes" to Question
No. 4?


 . . . . 


 Damage to reputation in the past.


 With respect to the publication of statements and implications regarding
which you answered "Yes" in answer to Question No. 6, damage to
reputation may be presumed; no evidence is required of damages. With
respect to the publication of statements and implications, regarding which
you answered "No" in your answer to Question No. 6, there must be evidence
of damage to reputation proximately caused by that publication. . . . 



(Emphasis added.) (3) Waste Management contends that the emphasized portion of this instruction to
Question 7 was improper because it allowed the jury to "award any amount it chose for reputation
damages regardless of the evidence" and because it "directed the jury to award excessive damages."
We disagree.

 Initially, we note that the instruction correctly states Texas law--statements that are
defamatory per se are presumed to injure the claimant's reputation and entitle the claimant to recover
general damages, including damages for loss of reputation, without proof of injury. See Salinas,
2012 WL 1370869, at *2 (citing Bentley, 94 S.W.3d at 604); Texas Disposal I, 219 S.W.3d at 584;
Peshak v. Greer, 13 S.W.3d 421, 427 (Tex. App.--Corpus Christi 2000, no pet.); see also Black's
Law Dictionary 1334 (defining proof as the "establishment or refutation of an alleged fact by
evidence"). Although an argument might be made that the instruction here is awkwardly drafted,
it does not, as Waste Management suggests, give the jury the unfettered right to award "any
amount it chose." It merely informs the jury that, having determined that the statements in the
Action Alert are defamatory per se, the jury may presume that Texas Disposal suffered damage.
After a semicolon, the instruction then explains that "to presume" damages means that "no evidence
is required of damages." See Black's Law Dictionary 1304 (defining "presume" as "[t]o assume
beforehand; to suppose to be true in the absence of proof"); Webster's Third New Int'l Dictionary
1976 (2002) (defining "presume" as "to accept as true or credible without proof").

 The question and instruction also properly limit the jury's award in that, under
the question as posed, the jury may only award an amount that "would fairly and reasonably
compensate" Texas Disposal for the damage to its reputation. A question that requests fair and
reasonable damages cannot be said to direct a jury to award excessive damages or to allow the jury
to award any amount regardless of the evidence. Further, perhaps with the exception of nominal
damages, any amount awarded by the jury is subject to an evidentiary review. See Bentley,
94 S.W.3d at 606 (holding that jury award for injury to reputation subject to evidentiary review);
see also Salinas, 2012 WL 1370869, at *2 (noting that regarding defamation per se, the law does
not presume any particular amount of damages beyond nominal damages and that the amount
of damages is a question for the jury). Thus, although the jury may presume that Texas Disposal
suffered damage without proof that Texas Disposal suffered damages, it must only award that
amount of damages that "fairly and reasonably compensates" Texas Disposal, and on review, there
must be evidence supporting the amount awarded. As such, the instruction here was not improper.
We overrule Waste Management's first issue.


Defamation per se

 In its second issue, Waste Management asserts that the district court erred by asking
the jury whether certain statements in the Action Alert "tend to affect an entity injuriously in its
business, occupation, or office, or charge an entity with illegal or immoral conduct"--i.e., the
defamatory-per-se standard--because whether a statement is defamatory per se is a question of law
for the court to answer. Rather than ask the jury this "ultimate legal question of defamation per se,"
Waste Management contends that the district court should have asked the jury predicate questions
of fact regarding the exact meaning and effect of the words in the Action Alert and then "entered
judgment for Texas Disposal only if defamation per se existed as a matter of law." In making this
assertion, Waste Management purports to rely on our decision in Texas Disposal I, arguing that we
directed the district court to ask the jury the predicate fact questions. We disagree.

 In Texas Disposal I, we held that although defamation per se is generally a legal
question, a trial court may pass that inquiry to the jury if ambiguities exist about the meaning and
effect of the words. See Texas Disposal I, 219 S.W.3d at 581 (citing Musser, 723 S.W.2d at 655).
We then determined that the district court's refusal to find in pre-trial rulings that the statements in
the Action Alert were defamatory per se did not mean that the court believed the statements were
not defamatory per se, but rather demonstrated that the district court "was not convinced as a matter
of law that no ambiguities remained on the issue" of whether the statements were defamatory per se.
Id. Accordingly, because Texas Disposal had preserved charge error by submitting in writing
"substantially correct questions and instructions related to these issues" and by objecting in writing
to the exclusion of these questions in the proposed charges, we held that it was error for the
district court to refuse to submit Texas Disposal's requested question and instructions about
defamation per se to the jury when the question was raised by the written pleadings and supported
by the evidence, namely evidence that Waste Management defamed Texas Disposal in a manner
injurious to its business. See id. at 582 (citing Tex. R. Civ. P. 278 for the proposition that "court is
required to submit questions, instructions, and definitions raised by written pleadings and supported
by evidence" and summarizing Texas Disposal's requested questions and instructions). We also
noted that although whether a statement is defamatory per se is generally a legal question, there
existed underlying ambiguities in the facts of this case that could not be decided as a matter of law
and needed to go to the jury--specifically, "the exact meaning and effect of the words because
much of the Action Alert's defamatory character arose not from its blatant statements but, rather,
from the impressions it created and inferences it encouraged." See id. at 582-83 (citing Musser,
723 S.W.2d at 655).

 On remand, the district court approved a jury charge that instructed the jury on
the meaning of "defamatory" and asked the jury to determine whether certain statements from the
Action Alert were defamatory and, if so, whether the statements were made with actual malice. For
those statements that the jury found had been made with actual malice, the jury was asked to
determine whether those statements "tend to affect an entity injuriously in its business, occupation,
or office, or charge an entity with illegal or immoral conduct?" As seen in the chart below, the
question submitted to the jury on remand is virtually identical to the question we approved as being
"substantially correct" in the appeal of the first trial. See id. at 582.



Omitted question from first trial
Question submitted at second trial
"Were any of the following statements,
impressions, or implications from the Action
Alert, or the Action Alert as a whole, . . .
defamatory per se?"

"With respect to each of the statements or
implications below . . . , does the statement or
implication tend to affect an entity injuriously
in its business, occupation, or office, or charge
an entity with illegal or immoral conduct?"
1. "There are no restrictions on the types of
waste that may be disposed of in the [Texas
Disposal] landfill, with the exception of
hazardous waste."
"There are no restrictions on the types of waste
that may be disposed of in the [Texas Disposal]
landfill, with the exception of hazardous
waste." 
2. "The [Texas Disposal] facility applied
for and received an exception to the EPA
Subtitle D environmental rules." (4)
"The [Texas Disposal] facility "applied for and
received an exception to the EPA Subtitle D
environmental rules."
3. "[Texas Disposal] does not use synthetic
liners while 'other landfills in Central Texas
and San Antonio in similar clay formations are
using the full synthetic liner in addition to the
clay soils.'"
"Other landfills in Central Texas and
San Antonio in similar clay formations are
using the full synthetic liner in addition to the
clay soils."

4. "The impression or implication created by
the Action Alert that the [Texas Disposal]
facility is environmentally less protective
than other landfills, including [Waste
Management]'s Austin Community Landfill."
"The implication that the [Texas Disposal]
facility is environmentally less protective than
other area landfills, including [Waste
Management]'s Austin Community landfill."

5. "The impression or implication created by
the Action Alert that the [Texas Disposal]
facility does not have a leachate collection
system." (5)
"The implication that [Texas Disposal] does
not have a leachate collection system."
6. "The Action Alert taken as a whole."

"A statement is defamatory per se if it tends to
affect an entity injuriously in its business,
occupation, or office, or charges an entity with
illegal or immoral conduct."
[see above] "does the statement or implication
tend to affect an entity injuriously in its
business, occupation, or office, or charge an
entity with illegal or immoral conduct."
"In deciding whether a statement, impression,
or implication is defamatory or defamatory per
se, you are to consider a reasonable person's
perception of the statement, impression, or
implication in the context of the Action Alert
as a whole, and in light of the surrounding
circumstances."
"You are to consider an ordinary person's
perception of the statement or implication in
the context of the Action Alert as a whole, and
in light of the surrounding circumstances."



(Omitted question is quoted from Texas Disposal's "Supplemental Proposed Jury Definitions,
Instructions, and Questions" from the first jury trial of this matter; formatting and order changed in
remand question for comparison purposes.) As such, the district court submitted a question that is
consistent with our holding in Texas Disposal I. See id. at 582-83. Thus, not only was it not error
for the district court to submit this question and instruction to the jury, the district court was bound
to do so under the law of the case. See Texas Parks & Wildlife Dep't v. Dearing, 240 S.W.3d 330,
347 (Tex. App.--Austin 2007, pet. denied) (discussing law-of-the-case doctrine and holding that
trial court abuses its discretion if it fails to carry out mandate of appellate decision). Likewise,
absent rare circumstances that are not evident here, we are bound by our initial decision that the
district court erred when it failed to submit to the jury the requested jury question and instructions
regarding defamation per se. See Briscoe v. Goodmark Corp., 102 S.W.3d 714, 716 (Tex. 2003);
Dearing, 240 S.W.3d at 348 ("Under the law-of-the-case doctrine, a court of appeals is ordinarily
bound by its initial decision on a question of law if there is a subsequent appeal in the same case.")
(citing Briscoe, 102 S.W.3d at 716).

 But even if the question and instructions submitted to the jury on retrial had not
tracked the question and instruction we reviewed and approved in Texas Disposal I, the submitted
question and instruction properly asked the jury to resolve the ambiguities that existed regarding
the meaning and effect of the statements and implications in the Action Alert. See id. at 582-83.
Specifically, the submitted question and instructions asked the jury to determine whether the
statements, looked at from an ordinary person's perception of the statement or implication in
the context of the Action Alert as a whole and in light of the surrounding circumstances, affected
Texas Disposal's "business, occupation, or office, or charge [Texas Disposal] with illegal or immoral
conduct." See Musser, 723 S.W.2d at 655 (holding that fact question about meaning and effect of
words may be passed to jury); Restatement (Second) Torts § 614(2) (1977) (providing that "jury
determines whether a communication, capable of a defamatory meaning, was so understood by
its recipient"). In other words, the jury here was asked to determine both whether the defamatory
statements in the Action Alert affected Texas Disposal's business as described and also whether
an ordinary person under the circumstances would have understood it to have that effect. Again,
allowing the jury to answer what would ordinarily be a legal question is proper where, as here, there
are underlying ambiguities that require resolution. See Musser, 723 S.W.2d at 655; Texas Disposal
I, 219 S.W.3d at 581.

 Waste Management contends that it was improper to submit this question
to the jury because "statements must be defamatory per se as a matter of law." Specifically,
Waste Management contends that to be defamatory per se, the trial court must determine as a matter
of law that the statements are (1) immediately and obviously harmful based on common experience,
(2) without resorting to extrinsic evidence, and (3) when viewed as a whole. But Waste Management
cites to no authority for this three-part test, and we do not agree that it accurately states the law with
regard to the facts of this case. We simply note this Court and several of our sister courts have
deemed a statement that injures a person in his office, business, profession, or occupation as
defamatory per se. See, e.g., Pitts & Collard, L.L.P. v. Schechter, --S.W.3d--, 2011 WL 6938515
(Tex. App.--Houston [1st Dist.] 2011, no pet. h.); Cullum v. White, --S.W.3d--, 2011 WL 6202800
(Tex. App.--San Antonio 2011, pet. denied) ("Publications are 'libel per se if they include
statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity,
or (2) are falsehoods that injure one in his office, business, profession, or occupation.'" (quoting
Main v. Royall, 348 S.W.3d 381, 390 (Tex. App.--Dallas 2011, no pet.)); Morrill v. Cisek,
226 S.W.3d 545, 549 (Tex. App.--Houston [1st Dist.] 2006, no pet.) ("Defamation is actionable
per se if it injures a person in his office, business, profession, or occupation."); Texas Disposal I,
219 S.W.3d at 581. Likewise, section 573 and comment e to section 569 of the Restatement
(Second) of Torts classify statements affecting another's business, trade, profession, or office
as defamatory per se. See Restatement (Second) Torts §§ 569 cmt. e, 573. Waste Management
emphasizes, however, that the statements in the Action Alert are "dry and technical" and thus were
not "immediately and obviously harmful based on common experience" because they are not "highly
inflammatory language that imputes immoral or illegal conduct." But again, the relevant questions
here are whether the statements in the Action Alert are defamatory--i.e., whether they tend "to harm
the reputation of another as to lower him in the estimation of the community or to deter third persons
from associating or dealing with him," see id. § 559--and if so, whether the defamatory statements
affect Texas Disposal's business, trade, profession or office, id. at §§ 569, 573.

 Waste Management also argues that the statements in the Action Alert cannot
be considered defamatory per se because they are not defamatory on their face, as shown by the fact
that Texas Disposal had to produce extrinsic evidence or innuendo to show the statements were
defamatory. But even assuming without deciding that Waste Management's premise here is correct,
we disagree that extrinsic evidence was necessary to show the statements' defamatory nature or, in
fact, that Texas Disposal produced evidence for that purpose. First, the defamatory nature of the
statements is apparent from the face of the Action Alert, which asserts that Texas Disposal operated
its landfill as an exception to EPA rules, did not have a required leachate collection system,
and accepted harmful or dangerous waste other than hazardous waste at its landfill. Each of these
statements plainly implies that Texas Disposal's landfill was dangerous or environmentally inferior. (6)
Second, it appears that the purpose of Texas Disposal's evidence was to establish the falsity of
these statements and implications and to show that Waste Management made the statements with
actual malice.

 Finally, Waste Management argues that it was error for the district court to ask
the jury about "isolated" sections of the Action Alert because Texas law requires the statement be
"viewed as a whole." See, e.g., Turner v. KTRK Television, Inc., 38 S.W.3d 103, 114 (Tex. 2000)
("We have long held that an allegedly defamatory publication should be construed as a whole in light
of the surrounding circumstances based upon how a person of ordinary intelligence would perceive
it.") In making this argument, Waste Management suggests that the jury charge here lifts the
relevant sentences or phrases out of context and thus reduces the jury to "microscopic wordsmithing,
rather than requiring their consideration of the Action Alert taken as a whole." We disagree. The
Action Alert itself was an exhibit available to the jury, and the charge clearly, plainly, and frequently
directs the jury to consider the Action Alert's implications and statements "as a whole" and "in light
of the surrounding circumstances." Further, the defamatory-per-se question instructs the jury to
consider "an ordinary person's perception of the statement or implication in the context of the
Action Alert as a whole, and in light of the surrounding circumstances." Thus, the jury did not
consider only isolated portions of the Action Alert. We overrule Waste Management's second issue
on appeal.


Business disparagement

 In its third issue, Waste Management argues that the district court erred in entering
judgment for Texas Disposal because Texas Disposal had "abandoned any claim for business
disparagement that might have supported the damages it sought and obtained." In making this
argument, Waste Management relies on its related assertion, which it urged in its second issue but
which we address here, that only a natural person can maintain a defamation cause of action.
Specifically, Waste Management argues that it was error for the district court to submit the
defamation-per-se question to the jury because a cause of action for defamation is available only to
natural persons, not to corporations such as Texas Disposal. Therefore, Waste Management asserts,
because Texas Disposal abandoned its business disparagement claim, Texas Disposal has no way
to recover the damages it seeks to recover here. But Waste Management cites no persuasive
authority for this proposition, and the Texas Supreme Court has specifically "recognized that a
corporation, as distinguished from a business, may be libeled." See General Motors Acceptance
Corp. v. Howard, 487 S.W.2d 708, 712 (Tex. 1972) (citing Newspapers, Inc. v. Matthews,
339 S.W.2d 890 (Tex. 1960); Bell Publ'g Co. v. Garrett Eng'g Co., 170 S.W.2d 197 (Tex. 1943));
see also Snead v. Redland Aggregates Ltd., 998 F.2d 1325, 1328 n.3 (5th Cir. 1993) (interpreting
Texas law to allow a corporation to bring a cause of action for libel) (citing Brown v. Petrolite Corp.,
965 F.2d 38, 43 n.5 (5th Cir. 1992); Howard, 487 S.W.2d at 712); Spincic v. Haber,
No. B14-87-00569-CV, 1988 WL 34894, at *4 (Tex. App.--Houston [14th Dist.] Apr. 14, 1988,
no writ) (mem. op., not designated for publication) ("A defamation action lies on behalf of a
corporation just as on behalf of an individual.") (citing Howard, 487 S.W.2d at 708); Restatement
(Second) of Torts § 561 ("One who publishes defamatory matter concerning a corporation is subject
to liability to it . . . if the corporation is one for profit, and the matter tends to prejudice it in the
conduct of its business or to deter others from dealing with it . . . ."); id. at cmt. b ("A corporation
for profit has a business reputation and may therefore be defamed in this respect."). Accordingly,
Waste Management's argument here is without merit and we overrule its third issue on appeal.




Actual Malice

 In its fourth issue, Waste Management asserts that there is insufficient evidence to
uphold the jury's finding that Waste Management published the alleged defamatory statements
or implications in the Action Alert with actual malice. In Texas Disposal I, Waste Management
raised, and we rejected, the same argument, although stated more broadly. See 219 S.W.3d
at 574-75 (rejecting Waste Management's argument that the take-nothing judgment should
be affirmed because there was not clear and convincing evidence of actual malice). Here,
Waste Management specifically urges that there is insufficient evidence of actual malice because
(1) "technical inaccuracies or rephrasings in matters of engineering and regulatory jargon are not
sufficient to show falsity," (2) "the statements in the Action Alert, at worst, are no more than an
understandable misinterpretation of ambiguous facts, which is insufficient to show actual malice as
a matter of law," and (3) Waste Management's agents "had a rational basis for believing the truth
of the statements."

 We have reviewed the evidence in this case and determined that it is essentially the
same evidence that was presented in the first trial, which we reviewed in our analysis of the evidence
supporting that first jury's finding of actual malice as asserted by Waste Management in its cross-appeal in Texas Disposal I. See 219 S.W.3d at 574-80. Although the first jury was asked about the
Action Alert in general terms--i.e., "Was the Action Alert false as it related to [Texas Disposal]?"
and "At the time the Action Alert was published, did [Waste Management] know it was false or have
serious doubts about its truth?"--and the second jury was asked separate questions about discrete
parts of the Action Alert--e.g., whether the implication from the Action Alert that Texas Disposal
does not have a leachate collection system was false when made and, if false, whether
Waste Management made the statement knowing it was false or with reckless disregard to its
falsity--our opinion in Texas Disposal I reviews that section of the Action Alert which served as the
basis for the discrete questions presented in the retrial. Thus, to the extent that Waste Management's
challenge here to the evidence supporting actual malice overlaps our recitation of the standard of
review and our evidentiary analysis in Texas Disposal I, we adopt here that standard of review and
analysis as appropriate to our review of this case. See id. (holding that the record contained clear and
convincing evidence that when Waste Management published the Action Alert, at a minimum it had
serious doubts about the Action Alert's accuracy); see also Tex. R. App. P. 47.1 ("The court of
appeals must hand down a written opinion that is as brief as practicable but that addresses
every issue raised and necessary to a final disposition of the appeal."). We will, however, address
the additional issues raised by Waste Management in this appeal that were not addressed in
Texas Disposal I. See Tex. R. App. P. 47.1.

 Waste Management first argues that the statements in the action alert are the type
of "technical, scientific, and regulatory jargon that are legally insufficient to support a finding of
actual malice." It references as examples the words "exception" versus "alternative," "leachate
finger drains" versus "leachate blanket," and whether compacted in situ clays are less reliable than
a composite liner, arguing that these are "technical and evaluative assessments that simply cannot
lend themselves to a characterization of knowing falsity." Initially, we note that the applicable
section of the Action Alert does not refer to "leachate finger drains" or to whether compacted in situ
clays are less reliable than a composite:


 Landfill Liner and Leachate Collection: Unlike other landfills in the Travis County
area, [Texas Disposal]'s landfill applied for and received an exception to the EPA
Subtitle D environmental rules that require a continuous synthetic liner at the landfill
and a leachate collection system utilizing a leachate blanket to collect water that
comes in contact with garbage (so that it cannot build up water pressure in a landfill).
[Texas Disposal] requested and received state approval to use only existing clay soils
as an approved "alternative liner" system, rather than use an expensive synthetic
liner over the clay. Other landfills in Central Texas and San Antonio in similar clay
formations are using the full synthetic liner in addition to the clay soils.



Nevertheless, in support of its argument, Waste Management relies on the Supreme Court's decision
in Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485 (1984), which held that the
imprecise language used in the publication at issue--specifically whether sound from speakers
traveled "along the wall" versus "about the room"--did not support an inference of actual malice:


 The statement in this case represents the sort of inaccuracy that is commonplace
in the forum of robust debate to which the New York Times rule applies. [Pape,]
401 U.S., at 292. "Realistically, . . . some error is inevitable; and the difficulties of
separating fact from fiction convinced the Court in New York Times, Butts, Gertz,
and similar cases to limit liability to instances where some degree of culpability is
present in order to eliminate the risk of undue self-censorship and the suppression of
truthful material." Herbert v. Lando, 441 U.S. 153, 171-172 (1979). "[E]rroneous
statement is inevitable in free debate, and . . . must be protected if the freedoms of
expression are to have the 'breathing space' that they 'need . . . to survive.'" New
York Times[], 376 U.S. at 271-272 (citation omitted).



Id. at 513. But unlike the underlying facts of Bose Corp., there is evidence in this record that the
language used was not merely inaccurate or made in error, but instead was known to be incorrect by
the parties instrumental in drafting the Action Alert and was specifically chosen to be negative
for Texas Disposal and to prevent San Antonio from awarding a contract to Texas Disposal. The
principal author of the Action Alert, Don Martin, testified that he knew that Texas Disposal's landfill
complied with EPA Subtitle D rules and knew that it would be false to say that Texas Disposal was
not in compliance with Subtitle D, but that he intended the Action Alert to give the reader the
impression that Texas Disposal had a "loophole" around those environmental rules such that it did
not comply. See 42 C.F.R. § 258.40 (setting forth EPA's design criteria for municipal solid-waste
landfills). He also testified that the purpose of the Action Alert was to suggest to its readers that
Texas Disposal's landfill was less environmentally safe. Likewise, Waste Management employees
involved with Martin in drafting the Action Alert testified that they knew that Texas Disposal's
landfill was in compliance with Subtitle D, that it was false to suggest that Texas Disposal operated
its landfill under an exception to Subtitle D, that it was false to suggest that Subtitle D requires a
continuous synthetic liner in order to be in compliance with Subtitle D, that it was false to say
that Texas Disposal's landfill did not have a leachate collection system, and that it was false to say
that Texas Disposal's landfill accepted everything except for hazardous waste. Thus, rather than
constituting imprecise language reflecting a misconception of a technical issue, see Bose, 466 U.S.
at 492, 513, the evidence here demonstrates that the concept was fully understood and that the
language used was deliberately chosen to have a harmful effect on Texas Disposal.

 Relatedly, Waste Management argues that the Action Alert merely expresses a
difference of opinion regarding the safety and reliability of Texas Disposal's landfill and that
differences of opinion cannot show actual malice. It relies, in part, on the Fifth Circuit's holding in
Peter Scalamandre & Sons, Inc. v. Kaufman. See 113 F.3d 556, 562 (5th Cir. 1997) (holding
that differences of opinion could not show actual malice). But again the evidence in this case
demonstrates that the statements and implications expressed in the Action Alert were not different
opinions as to disputed matters, but were statements and implications known to be false by people
involved with the drafting of the Action Alert that were specifically intended to give the impression
that Texas Disposal's landfill was less environmentally sound than other landfills.

 Waste Management focuses its argument on its assertion that, even though
Texas Disposal believes its landfill to be environmentally sound, other landfill engineers and
regulators strongly disagree; thus, Waste Management asserts, the implication that Texas Disposal's
landfill is less environmentally sound than other similarly situated landfills is simply opinion that
cannot support actual malice. But the Action Alert falsely states that the Texas Disposal landfill
operates as an exception to EPA rules requiring a synthetic liner and a leachate collection system,
see 42 C.F.R. § 258.40, and that Texas Disposal is allowed to operate using only the clay soil under
the landfill as an "alternate liner"--in other words, that Texas Disposal's landfill does not have a
liner or leachate collection system--whereas other landfills in the area use a full synthetic liner
under the same conditions. Likewise, the Action Alert falsely states that the Texas Disposal landfill
accepts all trash except for hazardous waste. These are not opinions regarding the relative
environmental soundness of the landfill, but rather factual assertions that Texas Disposal's landfill
does not have the environmental safeguards that the EPA requires and that other landfills in similar
situations use.

 Waste Management also argues that "the statements in the Action Alert are, at worst,
a rational and understandable interpretation of regulations and technical manuals that 'bristle
with ambiguities' and require specialized technological knowledge to identify as true [or] false." 
See Time Inc. v. Pape, 401 U.S. 279, 290 (1971) (referencing a document that "bristled with
ambiguities"). Specifically, Waste Management argues that "whether one characterizes the
[Texas Disposal] landfill as an 'exception' or as an 'alternative' is the type of semantic choice
of words that is legally insufficient to support a finding of knowing falsity." But several Waste
Management employees who participated in the drafting of the Action Alert, and its principal author,
Martin, testified that when the memo was drafted, they understood that there were two ways to
comply with Subtitle D--i.e., either a performance-based design or a composite liner--and that they
knew that Texas Disposal's so-designated "alternative design" was in compliance with Subtitle D.
Likewise, they stated that they knew that Texas Disposal's landfill had a leachate collection system
and that Subtitle D did not require a continuous synthetic liner. This knowledge, coupled with the
principal author's testimony that the intent behind using the word "exception" in the Action Alert
was to convey the message that Texas Disposal's landfill was not in compliance with Subtitle D,
belies Waste Management's argument here that Subtitle D "bristles with ambiguities," at least
with regard to this particular statement, and that use of the word "exception" is a "rational and
understandable interpretation" of Subtitle D. Instead, it suggests, as the jury found, that it was a
deliberate mischaracterization of the Texas Disposal landfill's compliance with EPA rules. We
further emphasize that, as complicated and technical as EPA rules may be, it is clear from the text of
Subtitle D that there are two acceptable designs and that neither of the two designs are "exceptions"
to the design rules:


 (a) New MSWLF units and lateral expansions shall be constructed:


 (1) In accordance with a design approved by the Director of an approved State or
as specified in §258.40(e) for unapproved States. The design must ensure that the
concentration values listed in Table 1 of this section will not be exceeded in the
uppermost aquifer at the relevant point of compliance, as specified by the Director
of an approved State under paragraph (d) of this section, or


 (2) With a composite liner, as defined in paragraph (b) of this section and a leachate
collection system that is designed and constructed to maintain less than a 30-cm
depth of leachate over the liner.



EPA Design Criteria for Municipal Solid Waste Landfills, 40 C.F.R. § 258.40 (1997).

 Finally, Waste Management argues that the evidence was legally insufficient to find
actual malice because the principal author of the Action Alert testified to his "honest belief in the
accuracy of the Action Alert's statements at the time of publication and because the statements in
the Action Alert have rational support in the known facts." But as we explained in Texas Disposal
I, "[b]ased on the jury's affirmative answers to falsity and actual malice, the jury must have
disbelieved these self-serving statements. As long as that determination was reasonable, we too
should ignore this evidence." Texas Disposal I, 209 S.W.3d at 577 (citing Bentley, 94 S.W.3d
at 599). Texas Disposal I then went on to examine the evidence supporting the jury's finding
of falsity and actual malice, concluding that it was clear and convincing. Id. at 579. Based on
essentially the same evidence and analysis we relied on in Texas Disposal I, see id. at 577-80,
specifically the fact that Waste Management's consultant, the principal author of the Action Alert,
and at least some of the Waste Management employees involved in drafting the Action Alert knew
at the time that certain of the statements were false, we again conclude that there is clear and
convincing evidence in the record that when Waste Management published the Action Alert, it had,
at a minimum, serious doubts about its accuracy.

 We overrule Waste Management's fourth issue.


Sufficiency of the evidence

 In its fifth issue, Waste Management brings legal- and factual-sufficiency challenges
on the following grounds: (1) the evidence supporting the jury's $5 million injury-to-reputation
award is legally insufficient because there is no evidence that the Action Alert caused any injury
to Texas Disposal; (2) the evidence supporting the jury's finding of falsity is legally and factually
insufficient because the Action Alert was substantially true as a matter of law; (3) there is no
evidence to support causation because Texas Disposal failed to establish that Texas Disposal's
reputation was injured, that it incurred remediation costs, or that there were not other causes for its
damages; and (4) the evidence is legally and factually insufficient to support the level of common
law or statutory malice for an award of exemplary damages.


 Standard of review

 A party challenging the legal sufficiency of the evidence supporting an adverse
finding on an issue for which an opposing party has the burden of proof will prevail if (1) there is
a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence
from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to
prove a vital fact is no more than a mere scintilla, (4) the evidence conclusively establishes
the opposite of the vital fact. See City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005); King
Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists
when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable
and fair-minded people to differ in their conclusions." Merrell Dow Pharms., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997) (quoting Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499
(Tex. 1995) (internal quotes omitted)). But if the evidence is so weak that it does no more than
create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. See
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).

 When conducting a legal-sufficiency review, we view the evidence in the light most
favorable to the judgment, crediting favorable evidence if a reasonable fact finder could and
disregarding contrary evidence unless a reasonable fact finder could not. City of Keller, 168 S.W.3d
at 807. We indulge every reasonable inference that would support the trial court's findings. Id.
at 822. "The final test for legal sufficiency must always be whether the evidence at trial would
enable reasonable and fair-minded people to reach the verdict under review." Id. at 827.

 When an appellant attacks the factual sufficiency of an adverse finding on an issue
on which he did not have the burden of proof, the appellant must demonstrate that the finding is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.
See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We review the factual sufficiency
of the evidence to support a jury verdict by considering and weighing all the evidence in a neutral
light, and we will set the verdict aside "only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust." Id. at 176. However, this Court is not a fact finder, and
we may not pass upon the credibility of the witnesses or substitute our judgment for that of the
trier of fact, even if a different answer could be reached upon review of the evidence. See Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).


Injury to reputation

 Waste Management asserts that the jury's award of $5 million for reputation damages
is not supported by legally sufficient evidence because there is "[no] evidence that publication of the
Action Alert caused the claimed damages." Specifically, Waste Management complains that "[n]o
witness identified a single customer that [Texas Disposal] lost or a single adverse act taken against
[Texas Disposal]." It also suggests that, to be entitled to reputation damages, Texas Disposal would
have had to elicit testimony, for example, that a person's impression of Texas Disposal was actually
diminished by the publication of the Action Alert. In support of its argument that the jury's finding
must be supported by evidence that the publication caused the claimed damages, Waste Management
relies on the Texas Supreme Court's decisions in Bentley, 94 S.W.3d at 605-06, and Saenz
v. Fidelity & Guaranty Insurance Underwriters, 925 S.W.2d 607, 614 (Tex. 1996).

 In Bentley, the Texas Supreme Court held that the First Amendment requires appellate
review of amounts awarded for mental-anguish and reputation damages in defamation cases "to
ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised
disapproval of the defendant." See Bentley, 94 S.W.3d at 605 (discussing non-economic award to
person in defamation per se case). But in addressing the defendant's initial argument regarding
whether an award of reputation damages was supported by the evidence, the Bentley court rejected
the defendant's argument that the evidence did not support any award of reputation damages, holding
that "[o]ur law presumes that statements that are defamatory per se injure the victim's reputation and
entitle him to recover general damages, including damages for loss of reputation." Id. at 604. Thus,
in the present case, we presume that publication of the Action Alert injured Texas Disposal's
reputation, based on the jury's finding that the Action Alert was defamatory per se.

 Beyond that presumption, however, we must still review the evidence to determine
whether its supports the amount awarded for reputation damages. See id. at 605-06 (noting that
the jury is bound by the evidence in awarding damages). Although the jury has some latitude and
discretion in assessing reputation damages, there must be evidence in the record that $5 million is
fair and reasonable compensation for the injury to Texas Disposal's reputation. See id.

 In this case, Texas Disposal's president Bob Gregory testified that publication of the
Action Alert injured Texas Disposal's reputation in the amount of $10 million. In support of that
amount, he explained why it was important for a business like Texas Disposal to have a good
reputation, what a good reputation is worth to a company, which he characterized as "priceless," and
specifically why it was important for Texas Disposal to have a good environmental reputation,
pointing out specific examples of environmental-reputation problems in Austin. He stated that,
before publication of the Action Alert, Texas Disposal had a good reputation in the central Texas
community, and Austin in particular, for running an environmentally sensitive or sound landfill. He
then described his impression of the environmental community's reaction to the Action Alert,
including reports that some of its members had "turned a cold shoulder" to Texas Disposal after the
Action Alert, and that Texas Disposal appeared to be, at the very least, no different from other
landfills. Gregory also provided financial information about Texas Disposal, including information
about the dollar amounts of its contracts that Texas Disposal claimed were put at risk by publication
of the Action Alert. Finally, he described in detail the actions he and his company had to take to
counteract or remedy the damage to its reputation. In addition to Gregory, the jury heard testimony
from Austin community members and environmentalists about their concerns when the Action Alert
was published. Finally, the jury heard testimony about Waste Management's purpose in publishing
the Action Alert--to give the impression that Texas Disposal's landfill was less environmentally
sound and to have an adverse effect on Texas Disposal in general.

 Taking all the evidence into consideration, we cannot say that the jury's award of
$5 million in reputation damages was excessive or unreasonable. Further, given that the jury rejected
part of Texas Disposal's request for its costs and expenses and all of its claim for lost profits, and
that it reduced Gregory's estimate of $10 million in reputation damages to $5 million, the jury's
award here does not appear to be "disguised disapproval" of Waste Management. See id. at 605
(requiring evidentiary review of exemplary damages to ensure that award is not jury's "disguised
disapproval of the defendant").

 Falsity

 In its second evidentiary-sufficiency argument, Waste Management asserts that the
"evidence on falsity is insufficient because the Action Alert was substantially true as a matter of law,
or is protected as non-actionable opinion." Specifically, Waste Management asserts that "the 'gist
or sting' of statements in the Action Alert is the same or less harmful than the true facts, when
taken as a whole and as understood by a reasonable reader of ordinary intelligence." See Turner,
38 S.W.3d at 115 (noting that "the substantial truth doctrine precludes liability for a publication that
correctly conveys a story's 'gist' or 'sting' although erring in the details). We disagree.

 The "gist" or "sting" of the Action Alert is that Texas Disposal's landfill is
environmentally unsound and less protective than other landfills, including Waste Management's
competing landfill, because it uses an "alternative liner" system through an "exception" to EPA
rules, whereas "other landfills" use the "require[d] . . . continuous synthetic liner . . . and a leachate
collection system  . . . ." See Texas Disposal I, 219 S.W.3d at 577. The truth, as we discussed in
Texas Disposal I and as demonstrated by the evidence in the record here, is that Texas Disposal's
landfill does not operate under an exception to EPA rules, but rather uses a performance-design
method that is designed in part to complement the environment in which it operates and that is one
of two methods specifically allowed or sanctioned under Subtitle D rules. See 40 C.F.R. § 258.10(a).
The evidence also shows that the performance-design method is, under EPA rules, environmentally
equal to the other method allowed under EPA rules, which requires a continuous synthetic liner. See
id. Further, the evidence shows that Texas Disposal's landfill was approved and licensed by the
Texas Natural Resource Conservation Commission (TNRCC), (7) and that the landfill's location in a
"low permeability" clay formation gives it some environmental advantages over other landfills.
Accordingly, Waste Management's argument that the "gist" or "sting" of the statements in the
Action Alert are not less harmful than the true facts falls flat.

 Waste Management argues that characterizing Texas Disposal's compliance with
EPA rules as an "exception" is both literally and substantially true because Texas Disposal was
allowed to construct its landfill without a continuous synthetic liner and leachate-collection system
utilizing a leachate blanket. Specifically, it asserts that the "so-called performance design" method
in section (a)(1) of Subtitle D is an exception to section (a)(2), which requires a design that includes
both a synthetic liner and continuous leachate collection system, and that the jury should have been
asked "if it was false to say that [Texas Disposal] received an exception to 'the EPA Subtitle D
environmental rules that require a continuous synthetic liner at the landfill and a leachate collection
system utilizing a leachate blanket to collect water that comes in contact with garbage (so that it
cannot build up water pressure in landfill).'" But that construction makes no sense. The evidence
establishes, and the plain language of Subtitle D shows, that there are two methods of
compliance--one is the performance-design method, which may include or not include any of these
systems depending on the site, and the other is the "general" or "default" method that has specified
requirements regardless of the site. Operation under either of these methods is within the Subtitle D
rules. If something is included within a rule, compliance with it cannot be said to be an exception.
See Black's Law Dictionary 644 (defining exception as "[s]omething that is excluded from a
rule's operation").

 Also in support of this argument, Waste Management complains that the jury question
regarding the Action Alert's "exception" statement was taken out of context. It points to evidence
showing that (1) 95% of the landfills in the country use a composite liner design; (2) none of the
expert engineers "had ever seen any other solid waste landfill lacking both a synthetic liner and
utilizing only 'finger drains'"; (3) the designer of Texas Disposal's leachate collection system has
never designed another landfill using the same system; and (4) TNRCC's 1997 list of alternate liner
designs showed only two other landfills using in situ clays with no synthetic liner and no other
landfills relying only on leachate drains. But while this evidence may show that Texas Disposal's
leachate system is not commonly used in other landfills, it does not inform the issue of whether
Texas Disposal's leachate system is an "exception" to EPA rules. That inquiry is informed by
provisions of the EPA rule itself, which as discussed above, provides two alternate, but equally
authorized under the rule, methods for design compliance. See 40 C.F.R. § 258.40(a). And the
evidence in the record here shows that Texas Disposal's landfill design complied with this EPA rule.
Accordingly, the Action Alert's statement that Texas Disposal's landfill was an exception to EPA
rules is not substantially true. In fact, based on the evidence and the jury's finding, it is false.

 Likewise, the district court did not, as Waste Management maintains, "erroneously
truncat[e] parts of the Action Alert" in its questions to the jury. As set forth fully above, the jury was
asked to answer whether the Action Alert's statement that Texas Disposal "applied for and received
an exception to the EPA subtitle D environmental rules" was false when made. Although that
question does not include the full sentence from the Action Alert, the jury was provided with a
complete copy of the Action Alert and was instructed in the jury charge "to consider an ordinary
person's perception of the statement or implication taken as a whole," and "construed in light of the
surrounding circumstances and based upon how a person of ordinary intelligence would understand
the entire statement or implication." (Emphasis added.)

 Relatedly, Waste Management argues that the statement in the Action Alert that
"There are no restrictions on the types of waste that may be disposed of at the [Texas Disposal]
landfill, with the exception of hazardous waste," is substantially true because the Texas Disposal
landfill cannot take hazardous waste and because the statement is "exactly the same as the sign
posted at the entrance to the [Texas Disposal] facility." Initially, we note that the evidence shows
that the sign at the Texas Disposal facility does not state that there are no restrictions on the types
of waste that the landfill may accept, nor does the sign suggest that hazardous waste is the only type
of waste that the facility may not accept. Instead, the sign provides that--


NO HAZARDOUS WASTE ACCEPTED


Non-hazardous special waste drums sludge and liquids 

will also be refused or returned at haulers expense 

unless previously approved by management in writing.



(Graphics omitted.) A plain reading of this sign suggests at least two reasonable interpretations:
(1) the landfill does not accept hazardous waste, or (2) the landfill does not accept hazardous
waste and certain other types of non-hazardous waste. This sign does not, however, support
Waste Management's suggestion that, outside of hazardous waste, there are no restrictions on the
type of waste that may be disposed of at the landfill. Regardless, the evidence in the record supports
the jury's finding that this statement in the Action Alert is false. Witnesses at trial testified that, in
addition to hazardous waste, the landfill did not accept, and could not accept pursuant to the terms of
its license, radioactive waste, class 1 nonhazardous industrial waste, sludge, bulk liquids, automobile
parts, tires, certain types of contaminated soil, used oil, and untreated medical waste. Further, the
author of the Action Alert testified that he was familiar with the technical definition of "hazardous
waste." Accordingly, the evidence is both legally and factually sufficient to support the jury's
finding that the statement is false.

 Waste Management also proclaims the truthfulness of the Action Alert statement that
"other landfills in Central Texas and San Antonio in similar clay formations are using the full
synthetic liners in addition to the clay soils." Specifically, Waste Management argues that of the
ten surveyed landfills, one had closed and the others had amended their permits to include composite
liners and, Waste Management argues, "[t]he fact that other landfills had grandfathered sections,
allowing them to finish filling out pre-Subtitle D liners, is precisely the kind of secondary detail that
the law treats as inconsequential." But again, there is legally and factually sufficient evidence to
support the jury's finding that this statement was false when it was made. Waste Management's
witness Loren Alexander testified that a "full synthetic liner" is a liner that covers the "entire bottom
of the landfill." In response to the question, "were any landfills in Travis County using full synthetic
liners as of the date of the Action Alert," Alexander responded, "No." Further, Alexander and
Robert Drenth, a former regional vice president of Waste Management, testified that, as of the date
of the Action Alert, Waste Management's Williamson County landfill did not have a synthetic liner
and its Austin and Comal County landfills did not have full synthetic liners.

 Waste Management also takes issue with the jury's finding regarding the
Action Alert's "implication that Texas Disposal's landfill does not have a leachate collection
system." First, Waste Management asserts that the jury question does not properly reflect what the
Action Alert actually says and, second, that what the Action Alert does state is substantially
true because the landfill does not have a continuous leachate-blanket system. As set forth above,
the Action Alert statement provides that, "Unlike other landfills in the Travis County area,
[Texas Disposal]'s landfill applied for and received an exception to the EPA Subtitle D
environmental rules that require a continuous synthetic liner at the landfill and a leachate collection
system . . . ." The clear import of this statement is that, having been granted an exception to the
EPA rule requiring a continuous synthetic liner and a leachate collection system, the Texas Disposal
landfill has neither a continuous synthetic liner nor a leachate collection system. Further,
Waste Management's regional vice president at time of the Action Alert acknowledged on cross-examination that the statement implies that Texas Disposal's landfill does not have a leachate
collection system. Thus, a jury question asking about the implication of this statement--i.e., that
Texas Disposal's landfill did not have a leachate collection system--was proper.

 The jury found that the Action Alert's implication regarding a leachate
collection system was false, and the evidence supports that finding. Texas Disposal's witness
Doctor Robert Kier, testifying as an expert in hydrogeology, testified that Texas Disposal's landfill
has a leachate collection system, which he defined as "an engineered system to collect leachate that
accumulates on the bottom or sides of a landfill" to prevent the leachate from migrating into the
groundwater. He further testified that it would be false to characterize Texas Disposal's landfill as
not having a leachate collection system. Engineer Pierce Chandler, who designed the Texas Disposal
landfill's leachate-collection system in 1994, testified that he considered the system that he designed
for the landfill--a system of interconnected drains--to be a leachate collection system and providing
a detailed description of the system in support of that conclusion. Likewise, there is documentary
evidence in the record, including a letter from TNRCC, that refers to the landfill's leachate collection
system. Conversely, there is nothing in the record to suggest that Texas Disposal's landfill does not
have a leachate collection system.

 Finally, Waste Management argues that the jury's finding that the Action Alert
contains an implication that Texas Disposal's landfill is environmentally less protective than other
area landfills is "erroneous" for two reasons: (1) the jury charge misstates what the Action Alert
actually says; and (2) "less protective" is an opinion rather than a fact. Initially, we note that the
Action Alert makes the following assertions regarding the environmental aspects of Texas Disposal's
landfill: it has no restrictions on the type of non-hazardous waste it will accept, it operates under an
exception to EPA regulations requiring a continuous synthetic liner or leachate collection system,
it uses only the clay soil under the landfill as an "alternative liner" system rather than an
expensive synthetic liner over the clay, and it is unlike the other landfills in the area that use full
synthetic liners. The Action Alert then provides contact information for those readers who have
"environmental or traffic" concerns. The principal author of the Action Alert, Don Martin, testified
that the purpose of the Action Alert was to show that Texas Disposal's landfill was "different,"
that it had an inferior design, and that it was less environmentally safe. Accordingly, the jury charge
was proper. See Tex. R. Civ. P. 278 (requiring trial court to submit questions, instructions and
definitions that are raised by the pleadings and evidence); Elbaor v. Smith, 845 S.W.2d 240, 234
(Tex. 1993) (citing rule 278 for the proposition that trial courts must submit requested questions to
the jury if the pleadings and evidence support them).

 Waste Management contends that, regardless of whether this jury question was
proper, the "environmentally less protective" implication is merely an expression of opinion and
not actionable fact. See Gertz, 418 U.S. at 339-40 (noting in dicta that "there is no such thing as a
false idea"). Waste Management argues that the relative safety levels of different landfills are not
objectively verifiable and there is no evidence in the record to support a conclusion to the contrary.
But each of the cases on which Waste Management relies involve situations where the opinion is the
publication. (8) In this case, the alleged opinion is inferred from the false statements in the Action Alert
about Texas Disposal's landfill, and those statements are objectively verifiable. Stated another way,
the implication of the false statements is that the landfill is less environmentally safe than other
landfills. Regardless, however, the law provides that a statement is non-actionable opinion if it is
not capable of being proved true or false. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20
(1990). In Milkovich, the Supreme Court noted that if a speaker of an alleged opinion states the
facts upon which he bases the opinion, and those facts are either incorrect or incomplete or if
his assessment of those facts is erroneous, the statement may still imply a false assertion of fact. Id.
at 18-19. As set forth previously, Texas Disposal presented evidence that its landfill has restrictions
on the type of non-hazardous waste it may accept, the landfill does not operate under an exception
to EPA rules that require a continuous synthetic liner and leachate collection system, and the landfill
has a leachate collection system that complies with EPA rules.

 We conclude that there is evidence in the record to support the jury's finding of
falsity. Further, considering all the evidence in the record, we cannot say that the jury's finding of
falsity is so one-sided that it is clearly wrong or manifestly unjust. Accordingly, we hold that the
evidence was legally and factually sufficient.


 Causation

 In its third evidentiary-sufficiency argument, Waste Management contends that the
evidence is insufficient to support causation because Texas Disposal failed to establish that the
Action Alert caused Texas Disposal any new reputation damage or remediation damage and because
Texas Disposal did not "negate alternate causes of damage it suffered." Regarding reputation, this
is essentially the same argument that Waste Management makes regarding the legal sufficiency of
the evidence supporting the jury's award of reputation damages--i.e., that there must be evidence
that publication of the Action Alert caused damage to Texas Disposal's reputation--and for the
same reasons, the argument here is also without merit: "Our law presumes that statements that are
defamatory per se injure the victim's reputation and entitle him to recover general damages,
including damages for loss of reputation and mental anguish." Bentley, 94 S.W.3d at 604; See Gertz,
418 U.S. at 349. Thus, because the jury found that the Action Alert is defamatory per se,
Texas Disposal is presumed to have suffered damage and is entitled to some amount of damages.
See Bentley, 94 S.W.3d at 604-05.

 As to Waste Management's assertions regarding the evidence supporting remediation
damages--i.e., that Texas Disposal failed to establish that its remediation expenses were caused by
the publication of the Action Alert--Texas Disposal's witnesses testified that it incurred expenses
in its attempts to remedy damages caused by the Action Alert. Specifically, Bob Gregory testified
that Texas Disposal devoted staff time worth more than $700,000 in an effort to combat the
Action Alert and that Texas Disposal had incurred actual out-of-pocket expenses of $450,592.02
for consultants it hired to combat the effects of the Action Alert. These consultant expenses
were supported by documentary evidence in the form of billing invoices. We conclude that there is
evidence to support the jury's finding that Texas Disposal suffered remediation damages. Further,
considering all the evidence in the record, we cannot say that the jury's finding here is so one-sided
that it is clearly wrong or manifestly unjust. Accordingly, we hold that the evidence was legally and
factually sufficient.


 Exemplary damages

 In its final evidentiary-sufficiency argument, Waste Management challenges the
award of exemplary damages--$20 million awarded by the jury, reduced to $1.6 million by the
district court's application of the statutory cap--arguing that the evidence was insufficient to support
the jury's finding of common-law malice.

 Under the applicable chapter 41 of the civil practice and remedies code, (9) a claimant
may be awarded exemplary damages "only if the claimant proves by clear and convincing evidence
that the harm with respect to which the claimant seeks recovery of exemplary damages results from
. . . fraud [or] malice . . . ." See Former Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). "Malice"
covers both intentional torts and gross negligence, and as to intentional torts, it means "a specific
intent by the defendant to cause substantial injury to the claimant." See id. at 109. (10)

 In this case, there was evidence that Waste Management's specific purpose in
publishing the Action Alert was to harm Texas Disposal by preventing the consummation of an
almost-final contract with the City of San Antonio worth millions of dollars over the course of
several years. There was also evidence that Waste Management's specific purpose in publishing
the Action Alert was to adversely affect Texas Disposal's ability to procure a long-term contract
with the City of Austin for waste management services that was in the bidding stage when
Waste Management published the Action Alert, which meant that Texas Disposal could not contact
Austin city officials directly regarding any matter. Specifically, Martin, the consultant hired to draft
the Action Alert, testified that he was told by Waste Management that the Action Alert needed to
be done quickly to prevent the consummation of the San Antonio contract. He also testified that a
purpose of the Action Alert was to make it appear that Texas Disposal's landfill was not in
compliance with EPA regulations, that Texas Disposal had "some loophole around the Subtitle D
regulations," and that the Texas Disposal landfill had an inferior design and was less
environmentally safe than other landfills in central Texas. And to effect that purpose, he directed
the publication of the Action Alert to San Antonio city officials and to the Austin environmental
community. The Action Alert itself directs readers to contact San Antonio and Travis County
officials with concerns or comments. Likewise, Waste Management's lobbyist Al Erwin testified
that the purpose of the Action Alert was to raise questions about the environmental integrity of
Texas Disposal's landfill. Thus, there is evidence in the record to support the jury's finding that
Waste Management published the false statements or publications with the specific intent to cause
Texas Disposal substantial harm.

 Waste Management argues that the evidence supporting a finding of malice must
show "much more than negligence, business competition, or even unethical behavior," citing for
support the Texas Supreme Court's decision in Qwest International Communications, Inc. v. AT&T
Corp., 167 S.W.3d 324, 326-27 (Tex. 2005) (recognizing that "in a competitive global economy,
time is often of the essence for businesses, jobs, and national productivity and prosperity. The
Legislature's balance of such-competing interests requires courts to adhere to the standard that
exemplary damages are available only if a corporation ignores an extreme risk of harm."). But
Qwest principally involved whether the defendant was grossly negligent in laying cable rapidly
and, as a result of the rapidity, repeatedly cutting AT&T's cables. See id. at 327. While the
supreme court also considered AT&T's argument that Qwest's policy showed a specific intent
to cause substantial harm to AT&T--i.e., the common-law malice prong of the applicable
definition--it rejected that argument because "a general corporate policy to work rapidly is
insufficient (without more) to support exemplary damages." See id. at 326. In this case, unlike
Qwest, there is more than a corporate policy to work rapidly or, for example, compete aggressively;
there is evidence that Waste Management intended to substantially harm Texas Disposal.
Accordingly, Qwest does not inform our decision here.

 Waste Management also contends that there must be evidence that it engaged in
"outrageous, malicious, or otherwise morally culpable conduct" and that the resulting harm is
extraordinary, such as "death, grievous physical injury, or financial ruin." See Rusty's Weigh Scales
and Serv., Inc. v. North Tex. Scales, Inc., 314 S.W.3d 105, 112 (Tex. App.--El Paso 2010, no pet.)
(quoting Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 16 (Tex. 1994) (noting that exemplary
damages punish a defendant for "outrageous, malicious, or otherwise morally culpable conduct"));
Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss, 202 S.W.3d 427, 447 (Tex. App.--Texarkana 2006,
no pet.). But Rusty's incorrectly suggests that a claimant must show both common law malice
and gross negligence to prove malice under the civil practice and remedies code, and importantly,
its discussion of "death, grievous physical injury, or financial ruin" is done in the context of a
discussion of gross negligence rather than common-law malice. See Rusty's, 314 S.W.3d at 112;
see also Former Tex. Prac. & Rem. Code Ann. § 41.001(7) (defining malice as specific intent to
cause substantial harm or gross negligence). Likewise, Moriel and Kinder Morgan involve analyses
of what evidence is required to support a finding of gross negligence--i.e., that the defendant
acted with an extreme degree of known risk in conscious indifference to the rights, safety, or welfare
of others--rather than an analysis of common law malice. See Moriel, 879 S.W.2d at 19-21
(discussing the statutory definition of gross negligence); Kinder Morgan, 202 S.W.3d at 447 (setting
forth the gross-negligence prong of the applicable definition of malice). Thus, these cases do not
inform our decision here either.

 In sum, to be eligible to recover exemplary damages in this case, the civil practice
and remedies code required Texas Disposal to show that Waste Management acted with malice,
which under the applicable definition of malice could be either common-law malice or gross
negligence. As discussed above, there is evidence in this case to support the jury's finding that
Waste Management acted with specific intent to cause substantial harm to Texas Disposal--i.e.,
common-law malice. Further, considering all the evidence in the record, we cannot say that the
jury's finding of actual malice is so one-sided that it is clearly wrong or manifestly unjust.
Accordingly, we hold that the evidence was legally and factually sufficient and overrule Waste
Management's fifth issue.


Exclusion of evidence

 In its sixth issue, Waste Management asserts that the district court erred in excluding
on hearsay grounds four TNRCC documents regarding Texas Disposal's solid-waste permit,
including two letters from TNRCC to Texas Disposal (Exhibits 13 and 14) and two TNRCC
interoffice memos (Exhibits 18 and 22). Waste Management argues that the district court's decision
to sustain Texas Disposal's hearsay objection and exclude these exhibits was error because
rule 803(8) of the Texas Rules of Evidence provides a hearsay exception for "[r]ecords, reports,
statements, or data compilations, in any form, of public offices or agencies setting forth . . . the
activities of the office or agency." See Tex. R. Evid. 803(8)(A). We disagree.

 We review a trial court's decision to admit or exclude evidence for an abuse
of discretion. In re J.P.B., 180 S.W.3d 570, 575 (Tex. 2005) (per curiam). A trial court abuses its
discretion if it acts arbitrarily or unreasonably or without reference to any guiding rules and
principles. Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam) (citing
Downer v. Aquamarine Operators, Inc., 791 S.W.2d 238, 241-42 (Tex. 1985)). We may not reverse
simply because we disagree with the trial court's decision; rather we may reverse only if the
trial court acted in an arbitrary or unreasonable manner. Beaumont Bank, N.A. v. Buller, 806 S.W.2d
223, 226 (Tex. 1991) (citing Downer, 791 S.W.2d at 242). Further, even if the trial court abused its
discretion in admitting or excluding the evidence, reversal is warranted "only if the error probably
caused the rendition of an improper judgment." See Bay Area Healthcare Grp., Ltd. v. McShane,
239 S.W.3d 231, 234 (Tex. 2007); see also Tex. R. App. P. 44.1(a)(1). "We review the entire
record, and require the complaining party to demonstrate that the judgment turns on the particular
evidence admitted." Nissan Motor Co. Ltd. v. Armstrong, 145 S.W.3d 131, 144 (Tex. 2004). "Thus,
if erroneously admitted or excluded evidence was crucial to a key issue, the error was likely
harmful." Reliance Steel & Aluminum Co. v. Sevcik, 267 S.W.3d 867, 873 (Tex. 2008). "By
contrast, admission or exclusion is likely harmless if the evidence was cumulative, or if the rest of
the evidence was so one-sided that the error likely made no difference." Id.

 Initially, we note that Waste Management does not provide any support for its
assertion that the district court abused its discretion by excluding the evidence as hearsay. Instead,
its briefing on this issue is limited to why the excluded evidence was relevant to this case and how
the exclusion prejudiced Waste Management. An appellant who fails to adequately brief an issue
waives that issue. See Tex. R. App. P. 38(i) (requiring appellate briefs to "contain a clear and
concise argument for the contentions made"); Divine v. Dallas Cnty., 130 S.W.3d 512, 513-14
(Tex. App.--Dallas 2004, no pet.); see also General Servs. Comm'n v. Little-Tex. Insulation Co.,
Inc., 39 S.W.3d 591, 598 n.1 (Tex. 2001) (holding that issue not properly briefed was not before the
court). Nevertheless, we will address the merits of this issue, beginning with some background
information about the exhibits.

 During the summer of 1993, Texas Disposal asked TNRCC to modify its existing
permit to allow it to use an "in situ alternate liner design" in its landfill. During the permitting
process, the TNRCC staff generated letters and internal memoranda regarding Texas Disposal's
modification request. Exhibit 13 is a November 24, 1993, letter to Texas Disposal regarding
TNRCC's review of the alternate-liner-design information Texas Disposal had included with its
modification request. (11) Among other matters, the letter recommends that Texas Disposal incorporate
"a leachate collection system . . . into the alternate liner design demonstration." Exhibit 14 is a
TNRCC letter dated April 29, 1994, notifying Texas Disposal that, based on TNRCC's preliminary
review of the alternate-liner documents submitted with Texas Disposal's modification request,
TNRCC was "disapprov[ing]" Texas Disposal's alternate liner design. Exhibit 18 is a September 7,
1994 TNRCC interoffice memorandum regarding its Municipal Solid Waste Division's review
of Texas Disposal's alternate liner design proposal. In that memo, the author recommends to the
TNRCC deputy executive director that TNRCC require Texas Disposal to install a leachate
collection system. Exhibit 22 is a November 9, 1994 TNRCC interoffice memo from three TNRCC
engineers to Ron Pedde, also a TNRCC engineer, regarding their "opinion" of Texas Disposal's
alternate liner design system and its compliance with Subtitle D. In the memo, the engineers state
that they "cannot recommend approval of the proposed alternate liner design." TNRCC ultimately
approved Texas Disposal's alternate liner design system on November 16, 1994.

 According to its offer of proof, Waste Management considered these documents to
be expert opinion testimony of TNRCC engineers showing "that the engineers tasked with enforcing
Subtitle D did not believe at the time that [Texas Disposal] had actually complied with Subtitle D,
that they hadn't met the standards." Waste Management argued that the exhibits were relevant to
issues regarding truth, causation, damages, and malice. In deciding to exclude the evidence, the
district court ruled that the statements in these documents--


 are relevant to whether or not the [Texas Disposal landfill] system is protective or is
as protective, whether or not it complies with Subtitle D, . . . but it's hearsay. And
it doesn't fall into the exception for public record given that this is expert opinion.
If anything, it's opinion testimony and only competent if it's expert opinion on a
crucial ultimate issue here of truth. And I do not believe the public record exception
was intended to cover or does cover those circumstances--or that circumstance
whether you consider it based on the untrust--or the untrustworthiness aspect of that
exception or otherwise.



Stated another way, the district court found that it should not admit these exhibits under the public-record exception to the hearsay rule because the court considered the documents' status as opinion
testimony to render them untrustworthy, see Tex. R. Evid. 803(8) (providing that public records may
be admitted as exception to hearsay rule "unless the sources of information or other circumstances
indicate lack of trustworthiness"), or because the court determined that rule 803(8) did not
cover expert opinion testimony of this type. Given the fact that, at the time the documents were
presented, the court had little or no information regarding the authors' qualifications to give the
expert opinions set forth in the documents, see id. 702 (requiring expert witness to be qualified to
give expert testimony "by knowledge, skill, experience, training, or education"), or regarding the
reliability of the opinions, see id.; E.I. du Pont de Nemours & Co., Inc. v. Robinson, 923 S.W.2d 549,
557 (Tex. 1995), we cannot say that the district court abused its discretion by determining that the
hearsay exceptions did not apply and excluding this evidence.

 Further, even if we were to assume that the excluded evidence was admissible and
the trial court erred in excluding it, it appears the information in these documents was cumulative
of evidence that was admitted into the record. Specifically, Erwin testified that the TNRCC staff
engineers did not believe that Texas Disposal's leachate collection system was sufficient and that
they believed that leachate would leak into the groundwater. Erwin explained why the TNRCC staff
engineers disapproved of Texas Disposal's system, including that computer modeling did not agree
with Texas Disposal's information. Further, Ron Bond, a former TNRCC engineer and the author
of exhibits 14 and 18, testified that he told someone at Waste Management that the TNRCC had
concerns about leachate generation, sidewall leakage, and other matters at the Texas Disposal
landfill. Thus, other evidence presented at trial showed that TNRCC staff had concerns regarding
the landfill's ability to protect the environment. To this extent, the excluded evidence was
cumulative and, as such, its exclusion was harmless. See Sevcik, 267 S.W.3d at 873. We overrule
Waste Management's sixth issue.


Exemplary Damages

 In its final issue, Waste Management challenges the jury's exemplary damage award,
asserting that it is grossly disproportionate to the alleged offense and, as a result, violates substantive
due process. An assessment of grossly excessive exemplary damages violates a party's substantive
due process rights because it "'furthers no legitimate purpose and constitutes an arbitrary deprivation
of property.'" See Bennett v. Reynolds, 315 S.W.3d 867, 873 (Tex. 2010) (quoting State Farm Mut.
Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003)); see also U.S. Const. amend. XIV, § 1 ("nor
shall any State deprive any person of life, liberty, or property, without due process of law"); Cooper
Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 433 (2001) (holding that the Due Process
Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary
punishments on a tortfeasor). Waste Management asserts that its conduct, which it contends could
only have resulted in economic harm, "was not sufficiently egregious to warrant a $1.6 million
punitive damages award."

 In our de novo review of whether the exemplary damage award is unconstitutionally
excessive, we must consider three guideposts adopted by the United States Supreme Court:


 1. "the degree of reprehensibility of the defendant's misconduct";


 2. "the disparity between the actual or potential harm suffered by the plaintiff
and the punitive damages award"; and


 3. "the difference between the punitive damages awarded by the jury and the
civil penalties authorized or imposed in comparable cases."



Bennett, 315 S.W.3d at 873 (quoting Campbell, 538 U.S. at 418) (referred to as the "Gore
guideposts" in reference to the Supreme Court's decision in BMW of North Am., Inc. v. Gore,
517 U.S. 559 (1996), which introduced these factors).

 The first Gore guidepost, which focuses on the reprehensibility of the conduct, is "the
most important indicium of the reasonableness of a punitive damages award." See Gore, 517 U.S.
at 575. In determining the degree of reprehensibility of the defendant's conduct, we are guided by
five nonexclusive factors: (1) whether the harm inflicted was physical rather than economic;
(2) whether the tortious conduct showed "an indifference to or a reckless disregard for the health or
safety of others"; (3) whether "the target of the conduct had financial vulnerability"; (4) whether "the
conduct involved repeated actions," not just "an isolated incident"; and (5) whether the harm
resulted from "intentional malice, trickery, or deceit," as opposed to "mere accident." See Bennett,
315 S.W.3d at 874 (quoting Campbell, 538 U.S. at 419) (some internal quotes omitted). The
presence of any one of these factors may still not be enough to support an award of exemplary
damages, and the absence of all of these factors renders the award suspect. Campbell, 538 U.S.
at 419 (citing Gore, 517 U.S. at 576-77).

 Given that this case involves no physical harm or danger to individuals, the first and
second reprehensibility factors do not weigh in favor of an award of exemplary damages. Likewise,
the fourth factor, regarding whether the conduct involved "repeated actions" or an "isolated
incident," would seem to weigh against an award of exemplary damages because Waste Management
published only one Action Alert.

 The remaining reprehensibility factors, however, appear to provide more support for
an award of exemplary damages. There is evidence in the record that Texas Disposal was financially
vulnerable because, at the time the Action Alert was published, Texas Disposal was finalizing a
long-term contract with the City of San Antonio that the Action Alert was intended to harm,
and also because the Action Alert threatened Texas Disposal's existing relationship with the City of
Austin and its contemporaneous efforts to bid and win another City of Austin contract. Also,
there was some evidence that the publication of the Action Alert was deliberately timed to coincide
with a restriction on Texas Disposal's ability to communicate with City of Austin officials
that was in effect as part of the bidding process. While there is no evidence to suggest that
Waste Management's publication of Action Alert "threaten[ed] financial ruin" for Texas Disposal,
see Bennett, 315 S.W.3d at 878, the evidence did show that Waste Management deliberately
targeted long-term contracts that represented millions of dollars for Texas Disposal over the next
several years. Thus, although the evidence established that Texas Disposal was eventually able to
consummate its contract with the City of San Antonio and continue its existing contractual
relationship with the City of Austin, it was financially vulnerable, when Waste Management
published the Action Alert, to the type of defamation in the Action Alert. Texas Disposal argues that
the Action Alert put its business at risk and harmed its general relationship with the City of Austin.
Thus, the financial-vulnerability factor appears to be neutral at best or, more likely, to weigh slightly
in favor of an award of exemplary damages. Finally, the remaining reprehensibility factor--i.e.,
whether the harm resulted from "intentional malice, trickery, or deceit," as opposed to "mere
accident"--also favors exemplary damages because, as discussed previously, the evidence
established that Waste Management specifically intended to cause substantial harm to
Texas Disposal. In sum, then, although a close question, the reprehensibility analysis in the second
Gore guidepost weighs slightly in favor of an award of exemplary damages on the facts of this case.

 Because the reprehensibility factors in this case do not conclusively support an
award of exemplary damages here, our analysis of the propriety of the award here turns largely on
Supreme Court's second Gore guidepost--i.e., the disparity between actual or potential and
exemplary damages, or the "Supreme Court's ratio analysis." See Bennet, 315 S.W.3d at 877
(holding that because only malice factor was shown, "the Supreme Court's ratio analysis must be
assiduously followed").

 The United States Supreme Court has not formulated a "a mathematical bright line
between the constitutionally acceptable and the constitutionally unacceptable" awards of exemplary
damages, see Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18-19 (1991), but it has warned that
an award that exceeds a 4:1 ratio of exemplary to actual damages "may be close to the line . . . of
constitutional impropriety." See Campbell, 538 U.S. at 425; see also Bennett, 315 S.W.3d at 877
n.47 (noting same and explaining that 4:1 ratio is derived from Anglo-American tradition of
"imposing 'double, treble or quadruple damages to deter and punish'" (quoting Campbell, 538 U.S.
at 425)). The Texas Supreme Court has applied this 4:1 ratio under circumstances similar to this
case--i.e., where the reprehensibility factors did not conclusively favor exemplary damages, with the
strongest being that the conduct was the result of intentional malice rather than mere accident--and
determined that a 4.33 to 1 ratio exceeded constitutional limits. See Tony Gullo Motors I, L.P.
v. Chapa, 212 S.W.3d 299 (Tex. 2006). On facts which it described as "not meaningfully
distinguishable from those in Gullo Motors," the Texas Supreme Court determined that an
exemplary to actual damage award of 47 to 1 was constitutionally excessive. See Bennett,
315 S.W.3d at 878. But unlike those cases, the ratio of exemplary damages to actual damages in this
case is far below the 4:1 threshold the Supreme Court has flagged for our caution. Here, the jury
awarded Texas Disposal $5,450,592.03 in actual damages and $20 million in exemplary damages,
which results in a 3.66 to 1 ratio. But more importantly, after correctly applying the statutory cap
on exemplary damages, an issue that we discuss in more detail below, the district court reduced the
exemplary damages award to $1,651,184.06, resulting in an exemplary damage award that is
one third of the actual damages--i.e., 3/10 (.3) to 1 ratio or, stated more dramatically, one-tenth
of the 4:1 ratio. This ratio does not trigger constitutional concerns. Further, the Gore analysis
also considers the potential harm, and the evidence here established that Waste Management's
Action Alert was intended to have an adverse effect on contracts worth tens of millions of dollars
to Texas Disposal. Thus, the second Gore guidepost, which focuses on the disparity between the
actual or potential harm and the punitive damages awarded, tips in Texas Disposal's favor.

 The final Gore guidepost calls for a comparison between the exemplary damages
awarded and the civil penalties that could have been imposed for comparable misconduct. See
Bennett, 315 S.W.3d at 880 ("The final guidepost compares the exemplary damages with
legislatively authorized civil sanctions."). There are, however, no civil penalties for the publication
of defamatory statements. To the extent that, by analogy, the Legislature's exemplary damages cap
constitutes "legislatively authorized civil sanctions," that analysis also supports the constitutionality
of the damage award here. For example, federal courts in this situation have looked to whether the
exemplary damages awarded comport with statutory caps on damages because damage caps
"represent[] a legislative judgment similar to the imposition of a civil fine." Zhang v. American
Gem Seafoods, Inc., 339 F.3d 1020, 1045 (9th Cir. 2003); see also EEOC v. Federal Express Corp.,
513 F.3d 360, 378 (4th Cir. 2008) (noting that exemplary damages award that falls within statutory
cap is reasonable and constitutional); Romano v. U-Haul Int'l, 233 F.3d 655, 673 (1st Cir. 2000)
("[A] punitive damages award that comports with a statutory cap provides strong evidence that
a defendant's due process rights have not been violated."). Here, the jury awarded $5 million in
exemplary damages, but the district court, as discussed more fully below, reformed the award to
$1,651,184.06, which equals the maximum amount of statutory damages allowed in a case with this
level of actual damages under the civil practice and remedies code. See Tex. Civ. Prac. & Rem.
Code Ann. § 41.008(b). Thus, while there are no civil penalties for comparison, the amount of
exemplary damages awarded here comports with the applicable statutory cap and, to the extent that
damage caps are analogous to a legislatively set civil penalty, the third Gore guidepost favors an
award of exemplary damages.

 After reviewing the "Gore" guideposts, we cannot say that the exemplary damage
award here violates Waste Management's due process rights. Further, the award is permissible under
Texas law because, as capped by the district court, it is within the statutory range of exemplary
damages allowed under the civil practice and remedies code. See Tex. Civ. Prac. & Rem. Code Ann.
§ 41.008(b). Accordingly, we overrule Waste Management's final issue.


TEXAS DISPOSAL'S APPEAL

 In its single issue on cross-appeal, Texas Disposal challenges the district court's
application of the statutory cap on exemplary damages to the jury's $20 million award of exemplary
damages. (12) Texas Disposal does not dispute the applicability of the statutory cap to its exemplary-damages award, but rather asserts that the district court erred in its calculation of the statutory cap by
erroneously characterizing the jury's $5 million award for injury to Texas Disposal's reputation as
"non-economic damages." See Former Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (exemplary
damages cap). This characterization was error, Texas Disposal argues, because damages awarded
to a for-profit corporation for injury to its reputation must be "economic damages" as that phrase is
defined in the applicable version of chapter 41 because of the pure economic nature of a for-profit
corporation. See id. § 41.001(5) (defining "economic damages" as "compensatory damages for
pecuniary loss"). Inasmuch as the Legislature amended chapter 41 in 2003 to include "injury to
reputation" in the list of specific examples of "noneconomic damages," this issue likely presents a
question of first and last impression for this Court, as Texas Disposal's counsel correctly noted
at oral argument. See Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, 2003 Tex. Gen. Laws
847, 887 (adding definition of "noneconomic damages" and including damages awarded to
compensate a claimant for "injury to reputation" in that definition) (codified at Tex. Civ. Prac. &
Rem. Code Ann. § 41.001(12) (West 2008)).


Standard of review

 Our review of this issue turns on construction of the pre-2003 version of the
Texas Civil Practice & Remedies Code. Statutory construction is a question of law that we
review de novo. See State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective
in statutory construction is to give effect to the Legislature's intent. See id. We seek that intent "first
and foremost" in the statutory text. Lexington Ins. Co. v. Strayhorn, 209 S.W.3d 83, 85 (Tex. 2006).
"Where text is clear, text is determinative of that intent." Entergy Gulf States, Inc. v. Summers,
282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing Shumake, 199 S.W.3d at 284; Alex
Sheshunoff Mgmt. Servs. v. Johnson, 209 S.W.3d 644, 651-52 (Tex. 2006)). We use definitions
prescribed by the Legislature and any technical or particular meaning the words have acquired;
otherwise we construe the words according to their plain and common meaning unless a contrary
intent is apparent from the context. City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26
(Tex. 2008). We also presume that the Legislature was aware of the background law and acted with
reference to it. See Acker v. Texas Water Comm'n, 790 S.W.2d 299, 301 (Tex. 1990). We further
presume that the Legislature selected statutory words, phrases, and expressions deliberately and
purposefully. See Texas Lottery Comm'n v. First State Bank of DeQueen, 325 S.W.3d 628, 635
(Tex. 2010); Shook v. Walden, 304 S.W.3d 910, 917 (Tex. App.--Austin 2010, no pet.). Our
analysis of the statutory text may also be informed by the presumptions that "the entire statute is
intended to be effective" and that "a just and reasonable result is intended." Tex. Gov't Code Ann.
§ 311.021(2), (3) (West 2005). Likewise, we may consider such matters as "the object sought to be
attained," "circumstances under which the statute was enacted," legislative history, "common law
or former statutory provisions, including laws on the same or similar subjects," "consequences of
a particular construction," and the enactment's "title." See id. § 311.023(1)-(5), (7) (West 2005).
However, only when the statutory text is ambiguous--i.e., susceptible to more than one reasonable
interpretation--"do we 'resort to rules of construction or extrinsic aids.'" Entergy Gulf States, Inc.,
282 S.W.3d at 437 (quoting In re Estate of Nash, 220 S.W.3d 914, 917 (Tex. 2007)). 


Statutory cap on exemplary damages 

 The applicable version of chapter 41 of the civil practice and remedies code
"establishes the maximum exemplary damages that may be awarded" to a claimant in a civil case.
See Former Tex. Civ. Prac. & Rem. Code Ann. § 41.002(b). To be entitled to an award of exemplary
damages, the claimant must first prove "by clear and convincing evidence that the harm with respect
to which the claimant seeks recovery of exemplary damages results from" fraud, malice, or, in
wrongful death actions, gross negligence or a wilful act or omission. See id. § 41.003(a). Even after
a claimant has so proven, however, any amount awarded as exemplary damages is then subject to
section 41.008(b), which provides a formula for establishing the maximum amount of exemplary
damages based on the character and amount of claimant's other awarded damages:


 (b) Exemplary damages awarded against a defendant may not exceed an
amount equal to the greater of:


 (1)(A) two times the amount of economic damages; plus

 

 (B) an amount equal to any noneconomic damages found by the jury,
not to exceed $750,000; or 


 (2) $200,000.



Id. § 41.008(b) (commonly referred to as the "statutory cap" on exemplary damages). Under this
calculation then, a higher economic-damage award results in a higher exemplary-damages cap.
See id. § 41.008(b)(1)(A). The applicable version of chapter 41 does not define "non-economic
damages," but it defines "economic damages" as follows:


 "Economic damages" means compensatory damages for pecuniary loss; the term
does not include exemplary damages or damages for physical pain and mental
anguish, loss of consortium, disfigurement, physical impairment, or loss of
companionship and society.



Id. § 41.001(4).

 Using this definition of "economic damages," the district court here determined that
the $5 million in damages awarded to Texas Disposal for injury its reputation were non-economic
for purposes of calculating the statutory cap, meaning that only $750,000 of the $5 million awarded
for reputation damages could be used in the cap calculation. See id. § 41.008(b)(1)(B) (allowing
lesser of non-economic damages or $750,000). The jury's award of $450,592.03 for lost profits and
expenses was Texas Disposal's only economic damages for purposes of calculating the statutory cap.
Accordingly, the district court's final judgment reduced the jury's $20 million exemplary damages
award to $1,651,184.06:


 $450,592.03 X 2 = $ 901,184.06 (two times the amount of economic
damages)


 + $ 750,000.00 (non-economic damages capped by statute)


 $ 1,651,184.06



See id. § 41.008(b).



Analysis

 Texas Disposal argues that the district court should have characterized the jury's
$5 million award for injury to Texas Disposal's reputation as economic damages for purposes of this
cap and, as a result, should have finally awarded Texas Disposal $10,901,184.06 in exemplary
damages--i.e., two times an economic damages total of $5,450,592.03--arguing that damages to
a for-profit corporation's reputation are economic damages as that term is defined under the
applicable version of chapter 41. While Texas Disposal's argument here regarding the types of
damages that a for-profit corporation can suffer makes for an interesting debate, we ultimately
disagree that the reputation damages awarded by the jury here are economic damages under the
applicable definition.

 To determine whether the jury's $5 million award for damages to Texas Disposal's
reputation should be classified as "economic" or "non-economic" damages, we look first to the
applicable definition of economic damages:


 "Economic damages" means compensatory damages for pecuniary loss; the term
does not include exemplary damages or damages for physical pain and mental
anguish, loss of consortium, disfigurement, physical impairment, or loss of
companionship and society.



See id. § 41.001(4); see also Lexington Ins. Co., 209 S.W.3d at 85 (directing courts to look "first and
foremost" at statutory text to determine the Legislature's intent). "Compensatory damages" are
damages that are awarded to make up for an injury. See Webster's 463 (defining same as "damages
awarded to make good or compensate for an injury sustained); Black's Law Dictionary 445
("Damages sufficient in amount to indemnify the injured person for the loss suffered."). "Pecuniary
loss" refers to a loss of money. See St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 531 (Tex. 2002) ("The
ordinary meaning of 'pecuniary' is 'of or pertaining to money.'"); see also Webster's 1663 (defining
"pecuniary" as "of or relating to money"). Thus, under the plain language of the applicable
definition, "economic damages" are damages that are awarded to compensate an injured claimant
for a loss of money. As such, our focus here is directed to whether the jury's award of $5 million
to Texas Disposal for injury to its reputation was intended to compensate Texas Disposal for a
monetary loss that it suffered--i.e., economic damages--or, by negative implication, whether the
award was to compensate Texas Disposal for a non-monetary injury.

 Texas Disposal presented evidence that the publication of the Action Alert caused
actual monetary losses in the form of consultant and attorney expenses, lost time for its employees,
lost profits due to delays in the San Antonio and Austin contracts, and carrying-cost and depreciation
expenses on equipment. Specifically, Texas Disposal presented testimonial and documentary
evidence that it incurred the following types and amounts of expenses or losses as a result of the
Action Alert's publication:



 $450,592.03 in consultant and attorney expenses to counteract the effects of
the Action Alert's publication;

 $724,277 for the value of the time spent by Texas Disposal employees in
connection with the publication of the Action Alert;


 


 $721,058 for estimated lost profits from contracts with the cities of Austin
and San Antonio ($491,707 for San Antonio and $229,351 for Austin); and 

 $304,900.61 for equipment carrying-cost and depreciation expenses incurred
because of the delay in finalizing the contract with the City of San Antonio,
which Texas Disposal characterized as also being part of it lost profits.




With regard to Texas Disposal's reputation, Bob Gregory of Texas Disposal testified that in
his opinion, publication of the Action Alert injured Texas Disposal's reputation by causing
Texas Disposal to lose credibility with the public and the environmental community and by slowing
Texas Disposal's base-business growth in the two years following publication of the Action Alert.
Based on Texas Disposal's calculations, Gregory estimated that, in his opinion, Texas Disposal
should have earned approximately $1.9 million more in income than it actually did in the two years
after publication of the Action Alert. When asked to express in monetary terms the amount of
damage done to Texas Disposal's reputation, Gregory said that a business's reputation was
"priceless" and almost impossible to value because it involved trust issues and standing in the
environmental community, but that he estimated that it was in the range of $10 million. Gregory did
not, however, testify as to what amount, if any, of the $1.9 million in foregone earnings he attributed
to the publication of the Action Alert; instead, his testimony regarding the $1.9 million estimate was
more in the nature of showing a decline in Texas Disposal's business. Further, Texas Disposal asked
the jury in closing argument to award $ 1,025,958 for its lost profits, $1,174,869.03 for its expenses,
and for the jury to use its judgment in deciding what amount to award Texas Disposal for the "hard-to-quantify reputation" damages, using as guidance Gregory's $10 million figure, but not referring
to the $1.9 million base-business figure. In sum, Texas Disposal claimed the evidence showed that
publication of the Action Alert (1) caused Texas Disposal to lose $2,200,827.64 in lost profits and
other expenses, and (2) injured Texas Disposal's reputation in an amount that was difficult to
calculate, but that Texas Disposal would estimate at $10 million.

 After hearing this evidence, the jury was asked in two questions to determine what
sum of money would fairly and reasonably compensate Texas Disposal for (1) its past lost profits
and reasonable and necessary expenses and (2) damage to its reputation. The jury awarded
Texas Disposal, in response to the first question, $0 for its lost profits and $450,592.03 for its
reasonable and necessary expenses--which amount exactly corresponds with the evidence regarding
the amount it spent on consultants and attorneys--and in response to the second question, $5 million
for damage to Texas Disposal's reputation. Given the evidence, Texas Disposal's characterization
of the evidence, the jury charge, and the jury's award, we conclude that the jury awarded
$450,593.03 to compensate Texas Disposal for its monetary losses of lost profits and other
expenses--i.e., economic damages--and the jury awarded $5 million in damages to compensate
Texas Disposal for the non-monetary--i.e., non-economic--injury to its reputation.

 Our analysis here, with its underlying focus on the purpose of the award, is supported
by the Texas Supreme Court's general characterization of reputation damages as non-economic
damages in Bentley. See 94 S.W.3d at 605. While Bentley involved defamation of an individual
rather than of a corporation, the supreme court's conclusion was focused, like ours here, on the
damage suffered and not on who suffered the damage: "Non-economic damages like [mental
anguish, character, and reputation damages] cannot be determined with mathematical precision; by
their nature, they can be determined only by the exercise of sound judgment." See id. Pecuniary
damages--e.g., lost profits, out-of-pocket expenses for consultants and attorneys--can be
determined by mathematical precision because they are concrete and already expressed in dollars.
Non-pecuniary losses--e.g., harm to reputation, mental anguish--cannot be easily calculated and
translated into monetary terms because they are not expressed in dollars and often not concrete.
Thus, a corporation injured by defamatory remarks may suffer pecuniary losses, such as lost profits
and out-of-pocket expenses, as a result of that defamation that we may correctly and easily
characterize with proper proof as economic damages. But it may also suffer non-pecuniary
losses--i.e., non-economic losses--such as injury to its reputation that cannot be readily quantified
or translated into a monetary loss--e.g., loss of standing in the community and tarnished image.
There is some logic to Texas Disposal's argument that because a corporation's reason for being is
pecuniary in nature, it can suffer only pecuniary damages, but the fact remains that Texas Disposal
can and did suffer the type of injury to its reputation that is similar in nature to that suffered by an
individual--i.e., loss of standing, tarnished image--that did not result in a direct or readily
measurable pecuniary loss to Texas Disposal. (13) 

 Texas Disposal argues that, based on the language of the applicable statute, damages
awarded to a corporation for injury to its reputation are economic damages because the statute's
definition does not list "injury to reputation" in its list of excluded damages. See Former Tex. Civ.
Prac. & Rem. Code Ann. § 41.001(4). This argument suggests that the definition's list of excluded
damages is exhaustive, but there is no indication of such an intent in the text of the definition and,
further, the list of excluded damages fails to include some other types of damages that, while not
listed, are obviously not pecuniary losses--e.g., loss of enjoyment of life. See Tex. Gov't Code Ann.
§ 311.005(13) (West 2005) ("'[i]ncludes' and 'including' are terms of enlargement and not of
limitation or exclusive enumeration, and use of the terms does not create a presumption that
components not expressed are excluded"); Texas Health Ins. Risk Pool v. Southwest Serv. Life Ins.
Co., 272 S.W.3d 797, 804 (Tex. App.--Austin 2008, no pet.); see also Tex. Civ. Prac. & Rem. Code
Ann. § 41.001(12) (including "loss of enjoyment of life" in current definition of "non-economic"
damages). At most, this omission of reputation from the list of excluded damages merely indicates
that reputation damages, and for that matter any other unlisted damages, are not expressly excluded
by definition. It does not, however, obviate the definition's initial requirement that, to be considered
economic damages, the damages must have been awarded to compensate the injured party for its
pecuniary losses.

 In a related argument, Texas Disposal argues that because all of the excluded damages
are types of injuries that only individuals can suffer, then it necessarily follows that only those types
of damages--i.e., that are ordinarily available only to people and that are "highly subjective" to a
person's feelings or pain--can be said to be excluded from the applicable definition of economic
damages. Because a corporation cannot suffer these types of personal damages, Texas Disposal
concludes, any damages to a corporation must be economic. But as discussed above, the fact that
a corporation's reason for being is pecuniary does not preclude it from suffering non-monetary
losses, such as its standing in the community, that cannot be readily translated into money damages. 
More important to our analysis here, however, is the fact that the statutory list of excluded damages
is not exclusive. See Tex. Gov't Code Ann. § 311.005(13).

 Finally, Texas Disposal argues that the Legislature's 2003 amendment to chapter 41,
which specified that reputation damages are non-economic, demonstrates that reputation damages
to a corporation were considered economic damages under the prior definition applicable here. (14)
Stated another way, Texas Disposal argues that the 2003 modifications to chapter 41 changed
reputation damages from economic to non-economic, at least for purposes of a for-profit corporation.
We find this argument unpersuasive, if only for the reason that a similar argument could easily be
made for the opposite construction--i.e., that the 2003 amendment clarifies the already existing rule
that reputation damages are non-economic damages. But more importantly, our analysis here is
restricted to the text of the applicable statute, not the text of the later-modified statute. See Texas
v. Fidelity & Deposit Co. of Md., 223 S.W.3d 309, 311 (Tex. 2007) (declining to consider the
Legislature's post-petition modifications to statute and instead confining its analysis to the applicable
statute as it existed prior to modification). But even considering the 2003 amendments to chapter 41,
Texas Disposal's argument is not persuasive because the 2003 amendments did not significantly
change the existing statute. Rather, the amendments merely altered the format of the definitions by
removing the list of excluded damages from the definition of economic damages and including them
with an added definition of "non-economic damages"; by expanding the definition of "economic
damages" to "compensatory damages intended to compensate a claimant for actual economic or
pecuniary loss"; and by further enumerating non-economic damages. These modifications did not,
however, change the rule that economic damages are damages awarded to compensate a claimant
for a pecuniary loss, nor did they change the fact that the newly listed non-economic damages would
have been non-economic damages under the pre-2003 statute to the extent that they did not
compensate a claimant for non-pecuniary losses. See Williamson Pointe Venture v. City of Austin,
912 S.W.2d 340, 345 (Tex. App.--Austin 1995, no pet.) (noting that if later legislation differs
significantly from existing law, that later legislation changes rather than clarifies existing law (citing
Tijerina v. City of Tyler, 846 S.W.2d 825, 828 (Tex. 1992)). 

 Finally, we note that under Texas Disposal's construction of chapter 41, the cap on
exemplary damages would apply differently, in effect, to individuals than it does to corporations.
Corporations, to the extent that they could only suffer economic damages, could benefit from a
higher statutory cap than would individuals suffering the same damages. Applying this construction
to the facts of this case, individual suffering the same damages would be entitled to $1.6 million in
exemplary damages, whereas Texas Disposal the corporation would be entitled to $10.9 million in
exemplary damages. There is nothing in text of the statute, in the case law, or in chapter 41's
legislative history that suggests that such an outcome was intended or is desirable.

 We hold that the jury's award for injury to Texas Disposal's reputation is non-economic and thus, the district court correctly applied the statutory cap on exemplary damages. We
overrule Texas Disposal's issue.


CONCLUSION

 Having overruled each of the parties' issues, we affirm the district court's judgment.



 __________________________________________

 Jeff Rose, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: May 18, 2012
1. The district court treated Texas Disposal as a public figure and the subject of the Action
Alert as a public issue. Because neither party challenges this treatment, we do not address it.
2. In contrast, statements that are defamatory per quod are actionable only upon allegation
and proof of damages--i.e., the plaintiff must prove both the existence and amount of the damages.
See Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc., 219 S.W.3d 563
(Tex. App.--Austin 2007, pet. denied).
3. Question No. 4 asked the jury whether Waste Management made the false statement in
the Action Alert with actual malice--i.e., "knowing it was false or with reckless disregard of whether
it was true or not." Question No. 6 asked the jury whether the statements in the Action Alert
"affect an entity injuriously in its business, occupation, or office, or charge an entity with illegal or
immoral conduct."
4. "Subtitle D" refers to EPA-promulgated regulations providing minimum federal criteria
with which all solid-waste landfills must comply. See 40 C.F.R. §§ 258.1-258.75 (2011).
5. "Leachate" is "[a] liquid that has passed through or emerged from solid waste." See
Tex. Admin. Code § 330.3(78) (2012) (Texas Commission on Environmental Quality, Definitions).
6. The specific EPA rule referred to here is found at 40 C.F.R. § 258.40 (1997) (EPA Design
Criteria for Municipal Solid Waste Landfills).
7. The TNRCC, or Texas Natural Resource Conservation Commission, was the administrative
agency charged with the statutory authority to issue solid-waste permits between 1993 and 2004. 
The Legislature changed TNRCC's name to the Texas Commission on Environmental Quality in
2001, to be fully effective as of January 1, 2001. See Act of May 28, 2001, 77th Leg., R.S., ch. 965,
§ 18.01, 2001 Tex. Gen. Laws 1933, 1985; See also Act of July 25, 1991, 72d Leg., 1st C.S., ch. 3,
§ 1.058, 1991 Tex. Gen. Laws 4, 20 (changing name from the Texas Water Commission to the
TNRCC); TCEQ History, http://www.tceq.texas.gov /about/tceqhistory.html (last visited April 23,
2011).
8. See Peter Scalamandre & Sons, Inc. v. Kaufman,113 F.3d 556, 562 (5th Cir. 1997) (holding
that statement that land application of sewer sludge is harmful to human health and the
environment is opinion); Robertson v. Southwestern Bell Yellow Pages, Inc., 190 S.W.3d 899,
902 (Tex. App.--Dallas 2006, no pet.) (holding that statement that plaintiff was "incompetent" is
opinion); MKC Energy Invs., Inc. v. Sheldon, 182 S.W.3d 372, 378 (Tex. App.--Beaumont 2005,
no pet.) (holding that statement that plaintiff's premises were "dangerous and unhealthy" is opinion);
Morris v. Blanchette, 181 S.W.3d 422, 425 (Tex. App.--Waco 2005, no pet.) (holding that statement
that doctor's surgical procedures were "totally unreasonable and substantially failed to meet the
professional, recognized standards" is opinion).
9. As will be discussed in more detail in our analysis of Texas Disposal's single issue on
appeal, the Legislature's 2003 amendments to chapter 41, see Act of June 2, 2003, 78th Leg., R.S.,
ch. 204, §§ 13.02-.09, 2003 Tex. Gen. Laws 847, 886-89, do not apply to this case, which was filed
in 1997.
10. Malice is defined as 


 (A) a specific intent by the defendant to cause substantial injury or harm to the
claimant; or 


 (B) an act or omission


 (i) which when viewed objectively from the standpoint of the actor at the
time of its occurrence involves an extreme degree of risk, considering
the probability and magnitude of the potential harm to others; and


 (ii) of which the actor has actual, subjective awareness of the risk
involved, but nevertheless proceeds with conscious indifference to the
rights, safety, or welfare of others.


Act of Apr. 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (hereinafter
"Former Tex. Civ. Prac. & Rem. Code).

11. Exhibit 13 is actually dated November 24, 1998, but that date appears to have been
stamped on the letter after it was generated and other evidence in the record refers to a similar letter
dated November 24, 1993. Further, TNRCC ultimately approved Texas Disposal's modification
request by November 16, 1994--i.e., well prior to 1998. Accordingly, because it does not appear
to affect the resolution of this issue, we will assume that the correct date for Exhibit 13 is
November 24, 1993.
12. The statutory cap on exemplary damages is codified in chapter 41 of the Texas Civil
Practice & Remedies Code. See Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West Supp. 2011)
(providing formula to determine the maximum amount of exemplary damages to which a claimant
is entitled); see also id. § 41.002 (Chapter 41 "applies to any action in which a claimant seeks
damages relating to a cause of action."). Because this case was filed in 1997, or prior to the
Legislature's 2003 modifications and amendments to chapter 41, the version of chapter 41 applicable
here is the version enacted by the Legislature in 1995. See Act of Apr. 11, 1995, 74th Leg.,
R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110 (applicable version of Chapter 41); see also Act of
June 2, 2003, 78th Leg., R.S., ch. 204, § 23.02(a), 2003 Tex. Gen. Laws 847, 898 (establishing
effective date of Sept. 1, 2003 for Legislature's 2003 changes to Chapter 41).
13. In a related argument, Texas Disposal asserts that "economic damages" mean damages
that can be estimated and compensated by money, and that damages for injury to a for-profit
corporation's reputation fit within this definition because injuries to a for-profit corporation's
reputation can be estimated, valued, and compensated in monetary terms. But all damages, including
obviously non-economic or non-monetary damages, can be and are regularly estimated in and
compensated by money. See Black's Law Dictionary 447 (9th ed. 2009) (noting in its definition of
"damages" that phrase "pecuniary damages" is a redundancy because damages are always pecuniary). 
Also, based on the plain language of the Legislature's definition of economic damages, what is
important for our determination here is the purpose of the award--i.e., whether the award
compensates Texas Disposal for a monetary loss or, by negative implication, a non-monetary
loss--and not whether the loss can be estimated and compensated with money.
14. In 2003, the Legislature amended section 41.001 to modify the definition of "economic
damages" and to add a definition for "noneconomic damages" that includes reputation damages:


 (4) "Economic damages" means compensatory damages intended to compensate
a claimant for actual economic or pecuniary loss; the term does not include
exemplary damages or noneconomic damages.


 . . . .


 (12) "Noneconomic damages" means damages awarded for the purpose of
compensating a claimant for physical pain and suffering, mental or emotional
pain or anguish, loss of consortium, disfigurement, physical impairment, loss
of companionship and society, inconvenience, loss of enjoyment of life,
injury to reputation, and all other nonpecuniary losses of any kind other than
exemplary damages.


See Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, Tex. Gen. Laws at 887 (codified at
Tex. Civ. Prac. & Rem. Code Ann. § 41.001(4), (12) (West 2008) (emphasis added).